**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
| | |
|---|---|
| WAYNE WAGNER, LAWRENCE CUNEO,<br>MARK EDWARDS, DAVID L. HALL,<br>CATHLEEN S. SCREEN, personal representative<br>of the ESTATE OF IAN SCREEN, STEVEN<br>GLASS, REGINA M. KEADY, executrix of the<br>ESTATE OF MICHAEL KEADY, TERA R.<br>FEAD and REGINA MILLER, | :<br><br>:    Civil Action No. 1:06-cv-03126 (RJS)<br><br>:<br><br>: |
| Plaintiffs, | : |
| v. | : |
| JP MORGAN CHASE BANK, | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR SUMMARY JUDGMENT AS TO LIABILITY**

---

Steven I. Adler (SIA 7573)
Jason R. Melzer (JRM 7941)
Warren A. Usatine (WAU 1187)
Cole, Schotz, Meisel,
Forman & Leonard, P.A.
A Professional Corporation
900 Third Avenue
16th Floor
New York, NY 10022-4728
212.752.8000
212.752.8393 (fax)
Attorneys for Plaintiffs

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES......................................................................................................iii

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

        A.      The SPA and the Earn-Out Payments ........................................................ 3

        B.      The Bank Fails to Spend Anything Close to the $6 million
                Required  by ¶ 7.2 of the SPA ................................................................... 6

        C.      The Bank's Bogus Technology Spend Figures.......................................... 8

        D.      The Bank's Breaches of ¶ 8.2 of the SPA and the Implied
                Covenant of  Good Faith ........................................................................ 14

LEGAL ARGUMENT ............................................................................................................ 17

    I.       THE BANK FAILED TO SPEND ANYTHING CLOSE TO THE $6
           MILLION REQUIRED BY THE SPA AND, THEREFORE,
           PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AS TO
           LIABILITY ON THEIR BREACH OF CONTRACT CLAIM. ......................... 17

    II.      THE BANK'S SALE OF PLEXUS DURING THE EARN-OUT PERIOD
           ALSO CONSTITUTES A BREACH OF THE IMPLIED COVENANT
           OF GOOD FAITH AND FAIR DEALING. ...................................................... 19

    III.     BASED ON THE UNCONTROVERTED FACTS PRESENTED,
           SUMMARY JUDGMENT IS APPROPRIATE. ................................................ 22

CONCLUSION ...................................................................................................................... 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

407 East 61st Garage v. Savoy Fifth Ave. Corp., 296 N.Y.S.2d 338 (1968).......................... 20, 22

A.W. Fiur Co., Inc. v. Ataka & Co., Ltd., 422 N.Y.S.2d 419 (1st Dep't 1979).............. 20, 21, 22

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505 (1987).................................... 23

Bass v. Sevits, 433 N.Y.S.2d 245 (3d Dep't 1980) ..................................................................... 21

D'Amico v. City of New York, 132 F.3d 145 (2d Cir. 1998), cert. denied, 524 U.S. 911
    (1998) ..................................................................................................................................... 22

Dalton v. Educational Testing Serv., 87 N.Y.2d 384 (1995)................................................ 19, 20

Gallo v. Prudential Residential Servs., 22 F.3d 1219 (2d Cir. 1994) .......................................... 23

Grad v. Roberts, 248 N.Y.S.2d 70 (1964).................................................................................... 21

J.P.Morgan Chase Bank, N.A. v. IDW Group, LLC, 2009 WL 321222 (S.D.N.Y. Feb. 9,
    2009) ...................................................................................................................................... 19

JP Morgan Chase v. J.H. Elec. of New York, Inc., 893 N.Y.S.2d 237 (2d Dep't 2010).............. 17

Kirke La Shelle Co. v. Armstrong Co., 263 N.Y. 79 (1933) ....................................................... 20

M/A-Com Security Corp. v. Galesi, 904 F.2d 134 (2d Cir. 1990)............................................... 19

Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).................................. 22

Murphy v. American Home Prods. Corp., 58 N.Y.2d 293 (1983) ............................................... 20

Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520 (2d Cir.2004) ................................ 17

Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62 (1978) .......................................................... 20

Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan, 7 F.3d
    1091 (2d Cir. 1993).......................................................................................................... 17, 18

Security Pacific National Bank v. Evans, 878 N.Y.S.2d 732 (1st Dep't 2009)........................... 19

Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir.1992)........................................... 18

Stern v. Premier Shirt Corp., 260 N.Y. 201 (1932).................................................................... 17

Tripodo v. Chase Manhattan Bank, 576 N.Y.S.2d 760 (N.Y. Civ. Ct. 1991).............................. 21

ii

West v. Weir & Barte, Inc. v. Mary Carter Paint Co., 267 N.Y.S.2d 29 (1st Dep't 1966)........... 22

Williams Press, Inc. v. New York, 37 N.Y.2d 434 (1975) ......................................................... 18

Zelazny v. Pilgrim Funding Corp., 244 N.Y.S.2d 810 (D.C.N.Y. 1963) .................................... 17

**RULES**

Rule 56 of the Federal Rules of Civil Procedure......................................................................... 1

Rule 56.1 of the Local Rules of Civil Procedure for the Southern District of New York.............. 3

**OTHER AUTHORITIES**

5 Williston, Contracts § 1293, at 3682 (Rev. Ed. 1937)............................................................. 20

## INTRODUCTION

Plaintiffs respectfully submit this brief in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Specifically, Plaintiffs seek summary judgment as to liability on Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

Plexus Group, Inc. ("Plexus") was a consulting services firm that specialized in enhancing the performance of investment managers, pension funds and securities brokers by assessing the costs involved in the trading process and providing insight into the competitiveness of a broker's execution skills. Plexus added value for its clients through the customized analysis of each client's trading data and distilled its analysis into practical recommendations for improving investment returns through better trading practices.

Prior to being sold, Plaintiffs established Plexus as the leader in the trade cost analysis ("TCA") industry. Due to the nature of its business, however, Plexus needed to upgrade and invest in emerging technology to maintain its competitive edge. Rather than make such a large capital infusion, Plaintiffs decided to sell Plexus to defendant JPMorgan Chase Bank ("Defendant," "JPMC" or the "Bank").

In August, 2002, Plaintiffs, the former shareholders of Plexus, along with the Trustee of the Plexus Group Employee Stock Ownership Plan ("ESOP"), sold their shares to the Bank pursuant to a stock purchase agreement (the "SPA" or the "Agreement"). See Hall Decl.,[1] Exh. A. Pursuant to the SPA, the Bank was to pay up to $25.6 million for Plexus' shares. Of that amount, $10 million related to the purchase of the ESOP and another class of shares, $6 million would be due to certain Plexus shareholders if they remained employed by, or were not

---

[1] "Hall Decl." refers to the Declaration of Plaintiff David Hall submitted in support of Plaintiffs' motion for summary judgment.

terminated for cause by, the Bank through December 31, 2005 and the $9.6 million balance (the "Earn-Out") was dependant upon Plexus hitting annual revenue targets for the five year period post acquisition beginning calendar year 2003 (the "Earn-Out Period").

In order to assist Plaintiffs in meeting or exceeding the annual revenue targets post acquisition, and thereby earn the balance of the purchase price, the Bank agreed in ¶ 7.2 of the SPA to invest not less than $6 million during the twenty-four (24) month period commencing on the closing date for the purpose of enhancing Plexus' "technology platform, and [software] applications and delivery systems". See Hall Decl., Exh. A, ¶ 7.2. The evidence obtained in discovery confirms, however, that the Bank invested substantially less than the agreed upon amount. In fact, many of the Bank's own documents confirm that it spent only between approximately $2 million and $3 million, in clear breach of contract.

In an attempt to demonstrate that it exceeded the $6 million required technology spend (the "tech spend" or the "spend") under the SPA, the Bank prepared a summary (the "Summary") in which it threw in "the kitchen sink." See Hall Decl., Exh. B. However, as confirmed by Plaintiffs' technology expert, many of these expenses were unrelated to enhancing Plexus' technology platform, software applications or delivery systems. Moreover, some of these expenses had nothing at all to do with Plexus. Accordingly, Plaintiffs are entitled to summary judgment on their breach of contract claim. See Point I, infra.

¶ 8.2 of the SPA also obligated the Bank to do all things necessary to enable Plaintiffs to consummate the transactions contemplated by the SPA. See Hall Decl., Exh. A, ¶ 8.2. This obviously included continued ownership of Plexus during the Earn-Out Period. Otherwise, Plaintiffs would not be able to reach their revenue targets. Regardless, the implied covenant of good faith and fair dealing compels a party to a contract with an earn-out based upon future

2

performance, such as the Bank, to continue to own the business during the timeframe that the sellers were allotted to earn the balance of the purchase price. Here, however, it is undisputed that in early January, 2006, two years before the end of the Earn-Out Period, the Bank sold Plexus to its main competitor. That decision, as a matter of law, caused the Bank to breach the covenant of good faith and fair dealing implied in the Agreement. See Point II, infra. Therefore, Plaintiffs are entitled to summary judgment on their claims for breach of contract and breach of the implied covenant of good faith and fair dealing. See Point III, infra.

## STATEMENT OF FACTS[2]

### A.    The SPA and the Earn-Out Payments

Plexus, based in Los Angeles, was founded by Wagner and Cuneo in 1986. They and the other Plaintiffs soon established Plexus as the leader and the best brand in the TCA industry. See Adler Decl.,[3] Exh. A. In fact, Wagner and Cuneo are considered icons in the TCA industry and they were viewed favorably by the Bank when it was conducting its due diligence prior to JPMC's acquisition of Plexus. See Adler Decl., Exh. B. Although Plexus was the leading provider of TCA services, had a stellar group of close to 200 clients (including Oppenheimer, Vanguard, NASDAQ and NYSE, to name a few), and had the most respected benchmark to measure trading efficiency, Plexus Average Execution Gain/Loss ("PAEG/L"), Plaintiffs realized that a substantial infusion of cash was needed to develop Plexus' technology in order to convert Plexus from a consulting services oriented business that analyzed client data in hard-copy paper reports on a quarterly basis to one that developed software applications (products) that would enable clients to review their trading data electronically on a daily or even "real-time"

---

[2] For a complete statement of the relevant and undisputed facts, the Court is respectfully referred to the Plaintiffs' Statement of Undisputed Facts Pursuant to Rule 56.1, dated April 16, 2010 ("56.1 Statement") submitted concurrently herewith.

[3] "Adler Decl." refers to the Declaration of Steven I. Adler, Esq. submitted in support of Plaintiffs' motion for summary judgment.

43187/0001-6427249v5

basis. See Adler Decl., Exh. A. Years earlier, Plexus was involved in discussions with, among others, the Bank about a joint venture which never materialized. In early 2002, the Bank again approached Plexus, this time concerning acquiring the business. Id. These discussions eventually led to the parties entering into the SPA.

The deal between Plaintiffs and the Bank, as reflected in the SPA, closed in the latter part of August, 2002. The Bank was to pay at most $25.6 million for Plexus, although the Bank valued the company at $31.6 million. See Adler Decl., Exh. A., p. 9. However, $9.6 million, equal to approximately forty percent (40%) of the purchase price, was dependant upon Plaintiffs hitting certain revenue targets during the five year Earn-Out Period. The Earn-Out payments could be as much as $1.2 million per year for the first three years after the closing and were conditioned upon the achievement of annual revenue targets for calendar years 2003, 2004 and 2005. See Hall Decl., Exh. A, ¶ 2.2. The Earn-Out payments were as much as $3 million per year for years four and five and were conditioned upon the achievement of annual revenue targets for calendar years 2006 and 2007. If a portion of any payment for a particular year was not achieved, it could still be earned later during the remaining Earn-Out Period by meeting certain cumulative revenue targets.

Plexus was acquired at the behest of John Phinney ("Phinney"), Senior Vice-President of the Bank, to be part of his Information Products Group ("Infoco"). Plexus was intended by Phinney and the Bank to be one of four pillars in its Total Cost Management ("TCM") product suite aimed at differentiating its custody offering (i.e. trade execution, settlement risk, research and asset management.) See Adler Decl., Exh. A. Plexus would be the entity involved in analyzing trade execution costs, Trade Starr would handle settlement risk and ultimately Investars would handle research cost analysis.

4

With regard to upgrading Plexus' technology, the Bank agreed in the SPA to invest no less than $6 million during the two years subsequent to the closing. See Hall Decl., Exh. A, ¶ 7.2. The SPA clearly noted that the minimum $6 million investment was for the purpose of enhancing Plexus' "technology platform and [software] applications and delivery systems." See Id.

As confirmed by Plexus' technology expert, the reference to Plexus' "technology platform" means its "legacy software programs that cobbled together and manufactured what was needed for Plexus' consultants to provide their services. The reference to "applications" means a software program or group of programs designed for end users, such as database programs, word processors and spreadsheets. Finally, the reference to Plexus' "delivery system" means moving Plexus from its hard copy reports to delivering the information electronically via the world-wide web (the "web") or an ASP model. The Bank's own documents confirm that the goal of the tech build was to "transform the Plexus environment from a paper-based, quarterly product delivery to an on-line internet delivery." See Adler Decl., Exh. C. The $6 million guaranty in ¶ 7.2 of the SPA assured Plaintiffs of a minimum level of investment to accomplish this goal.

With the exception of a product called "TransPort", which was an end-user software application, Plexus at the time of the JPMC acquisition offered only consulting services based upon paper reports produced by the legacy Plexus systems. That is why nearly all of its client contracts were service agreements. Therefore, as of the acquisition, Plexus' business model was a service/product hybrid. Yet, none of Plexus' 'products' of its legacy systems were marketable without the human component of service being added. Plexus' 'products'' called Alpha Capture Service ("ACS"), Sponsor Monitor ("SM"), Broker Edge Monitor ("BEM"), "Transitions" and

5

"TECO",[4] all fit this service/product paradigm. But none of them were "applications" in that they were not delivered to market in the form of end-user software from which a customer could generate and report on the analysis of their activities, and arrive at a level of understanding of the results that did not require significant consulting services.

## B.    The Bank Fails to Spend Anything Close to the $6 million Required by ¶ 7.2 of the SPA

The Bank undeniably breached ¶ 7.2 of the SPA. In fact, Defendant's own documents pertaining to the 2003 and 2004 capital expenditures for Plexus' technology build confirm beyond peradventure that the Bank spent substantially less than the required minimum of $6 million during the twenty-four (24) month period after closing.[5] The Bank's own records reflect it spent in the range of only about $2 million to $3 million.[6],[7] -- a far cry from what was required by the SPA.

The Bank's failure to live up to its capital expenditure promise, and within the time frame called for in the SPA, was devastating to Plaintiffs. Through the extraordinary efforts of its key personnel, Plexus was able to "squeak by" in 2003 and 2004 by just reaching the minimum eighty (80%) percent of revenue target necessary to earn a reduced Earn-Out payment for each

---

[4] ACS traced equity investments from conception through execution. SM was an in-depth analysis of the effectiveness of managers' trading and implementation. BEM looked at a broker's trading versus that of peers. See Hall Decl., ¶ 11, fn. 1.

[5] Indeed, the Bank's Investment Committee did not authorize any capital spending on Plexus until sometime in 2003, well into the first year post-closing. See Adler Decl., Exh. D. At that time it rejected a request for $7.1 million for the Plexus technology build and approved only a $3 million expenditure. See Adler Decl., Exh. D. Similarly, for all of calendar year 2004 the Committee approved just another $3 million, the bare minimum needed to reach the $6 million level called for by the SPA assuming it was all spent by August 31, 2004. See Adler Decl., Exh. E. The Bank's argument that it spent substantially more than the $6 million required is, therefore, sheer folly.

[6] The Bank claims to have spent only $1.328 million in 2004 for Infoco as of June 25, 2004, two months prior to the second anniversary of the closing date. See Adler Decl., Exh. C, p. 6. Infoco included all four pillars of TCM.

[7] Various Bank documents reflect it spent between $2.3 million and $2.8 million in capitalized costs. All of the Bank's expenses related to the Plexus technology build should have been capitalized considering this project was to last well in excess of one year. See Adler Decl., Exhs. F & G, p. 1, n. 1)

of those two years. The Bank's breach, however, had a snowball effect, causing Plexus to fall short of the minimum revenues necessary to earn any payment for 2005 and precluded Plaintiffs from recouping on a cumulative basis the difference between the possible maximum payments available for 2003 and 2004 and the reduced amounts they had received. See Hall Decl., Exh. A, ¶ 2.2(c). These depressed revenue figures for 2003, 2004 and 2005 occurred during the best market conditions the TCA industry had ever seen and a period in which Plexus' competition widened the technology gap. In fact, Plexus lost its competitive advantage and fell to number two in the industry during a period when it should have been distancing itself even further from its competitors.

As previously noted, the bargained-for capital infusion of $6 million was to be used to upgrade and replace existing technology and operational processes with state-of-the-art technology and improved product functionality and features for its entire product set. Rather than make the necessary investment, the Bank caused Plexus to be reliant on its old legacy technology and its old consulting services model of doing business. Without upgraded technology and new products, which had been promised to Plexus' clients by the Bank, Plexus' ability to reach its expected revenue growth was crippled and sales and customer retention were impacted dramatically.

The Bank was well aware that underperformance would result from its failure to make the agreed upon investment in Plexus' technology. Prior to the SPA closing, the combined Plexus/JPM due diligence team spoke to many Plexus clients. They noted the need for an overhaul of Plexus' technology. Most also expected a new set of product capabilities. In a November 26, 2002 e-mail, Phinney accurately predicted that "[a]bsent this level of commitment and evidence that [the Bank] was indeed committed to the re-architecture and new product

7

development plans, many of these (Plexus) clients will opt for competing products." See Hall

Decl., Exh. C. In that same e-mail, Phinney stated as follows:

> The impact of reduced technology spending on morale will also be
> a significant issue. All key Plexus Managers were involved in the
> decision to "sell the company" and most of their capital
> appreciation compensation comes in the form of "Earn-Out"
> payments that come in later years. Their confidence in getting
> these payments is predicated upon the aforementioned capital
> investment. . . .

[See Hall Decl., Exh. C.]

On September 29, 2004, about one month after the expiration of the two-year period to

make the $6 million expenditure, Plaintiffs wrote to the Bank requesting an accounting of the

technology spend to determine the amount the Bank claimed it spent pursuant to ¶ 7.2 of the

SPA. That request was ignored. Plaintiffs sent a follow up letter on November 3, 2004. That

letter indicated it was "a second formal request for a complete, detailed and final accounting of

the mandatory 'technology spend' of $6 million that is set forth in the [SPA]." Id. The Bank

again failed to respond. Discovery in the litigation revealed why. Most of the money simply

was not spent.

## C.    The Bank's Bogus Technology Spend Figures

It was only during this lawsuit that the Bank finally produced two documents that

summarize the amount the Bank contends it spent towards enhancing Plexus' technology

platform, applications and delivery systems. The first is an excel spreadsheet, identified as

"TCM PAR 2003-2004.xls (the "Spreadsheet") for the years 2003 (see Hall Decl., Exh. D) and

2004 (see Hall Decl., Exh. E) and the one-page Summary (see Hall Decl., Exh. B).

In the Summary the Bank calculated its spend over two different time periods. The top

box on the page calculates the Spend through August 31, 2004 (two years post-closing), in

accordance with the SPA. The second or middle box on the page calculates the Spend through

December 31, 2004 (more than two years post-closing). This second time period is irrelevant to the Bank's obligations under the SPA. Finally, in the bottom box of the Summary the Bank threw in every expenditure it could think of, hoping some thing might stick, to arrive at a gross number of $9,338,774. See Id. However the Bank concedes in the top box of the Summary that, with regard to Plexus, it spent only $3,714,877 during the relevant two year period after the closing. Moreover, even adding miscellaneous expenses allegedly incurred by the Bank for TCM and GMRD (both discussed below as being unrelated to Plexus' platform, applications and delivery system), the Bank could only come up with a grand total of $5,453,729 for the "Total Plexus Dev" Spend through August 31, 2004. (Emphasis added.) As set forth below, the Bank's numbers for Plexus are grossly inflated.

    **(i)**    **2003**

        **(a)**    **Valued Holdings, Trade Starr, Efritz, TCM and GMRD**

In the top box of the Summary, referencing the Bank's alleged Plexus Development Spend between the closing and August 31, 2004, the Bank claims to have spent during calendar year 2003 a grand total of $3,011,330. However, as plainly evident from the Summary, that Grand Total relates to Valued Holdings, Trade Starr, Efritz, GMRD, and TCM in addition to Plexus. Yet, Valued Holdings, Trade Starr, Efritz, and TCM were all business units or products of JPMC's InfoCo, and not of Plexus. Thus, they were irrelevant in terms of the Plexus build. Any money expended on these business units or their products did not in any way enhance Plexus' "technology platform, [software] applications or delivery systems." Therefore, all of the expenses must be excluded from any assessment of expenditures pursuant to SPA, ¶7.2, as was

43187/0001-6427249v5

conceded by one of the Bank's executives with the most knowledge concerning the Plexus build.[8]

Thomas Campfield, the Bank's Managing Director for "Investor Services" (the JPMC Division responsible for managing Infoco and, in turn, Plexus), and the Bank executive chosen by JPMC to oversee Plexus' technology build, admitted at his deposition that any expenses related to Valued Holdings and Efritz in no way enhanced Plexus' technology platform, software applications or delivery systems. See Adler Decl., Exh. I, p. 63, 1.15 – p. 64, 1.3 and p. 76, l. 7 - 22 . Campfield also admitted that Trade Starr was one of the Bank's products in existence prior to its acquisition of Plexus and any development work related to Trade Starr post-acquisition did not directly relate to Plexus. See Adler Decl., Exh. I, p. 64, l. 19 – p. 66, l. 16. Throughout his testimony, Campfield clearly delineated the work that was performed on Valued Holdings, Trade Starr, and Efritz from work that related in any way to the Plexus build. See e.g., Adler Decl., Exh. I, p. 69, l.21 -24.

Similarly, and in addition, within the 2003 expenditure of $1,931,135 allegedly associated with Plexus, is a $371,790 charge (see Hall Decl., Exh. D, Row 215; Rows 130-134) for "Build Total Cost Mgt Service Sum", which is clearly for TCM, not Plexus. Again, any work developing a product for another business within Infoco, by definition, could not have

---

[8] The only possible exception could have been GMRD, which was the acronym for JPMC's Global Market Reference Database. At some point in their development, certain InfoCo products may have required integration development work in order to access GMRD's data. The only Plexus product which would have needed access to GMRD was a product to measure TCA for "fixed income" securities. For every other product being worked on post-acquisition, Plexus had its own data warehouse and did not need GMRD. However, the work to create a fixed income product had not even begun during 2003. Indeed, in the Plexus technology build plan (the "Build Plan") prepared by Plaintiff Ian Screen ("Screen"), Plexus' anticipated nine man-months of effort for this purpose, which was only slated to begin at the end of the Build in the fourth quarter of 2004. Therefore, the Bank's inclusion of this GMRD expenditure in 2003, one year ahead of the Build Plan, confirms that this expense could have related only to the integration with one of the InfoCo products (and not a Plexus product) and should not be included as part of the Plexus technology build expenses pursuant to ¶ 7.2 of the SPA. Phinney himself confirmed at deposition that GMRD was not chargeable to the Plexus Build. See e.g., Adler Decl., H, p. 178-79.

10

43187/0001-6427249v5

enhanced Plexus' technology platform, its applications, or its delivery systems. That amount should have been included on the TCM line in the Summary and should have been excluded from the $1,931,140 total assigned to Plexus in the Bank's analysis.

### (b)   Inalytics Reports

Very soon after the Bank's acquisition of Plexus, resources were diverted away from the Build Plan to satisfy some new reporting requirements demanded by Inalytics, a U.K. company with whom the Bank entered into a joint venture relationship at the same time the Bank acquired Plexus to serve as Plexus' sales force in Europe. These reports did not fit the definition of ¶ 7.2 of the SPA because:

•        Their development did nothing to enhance Plexus' technology platform. Plexus already had the ability to create and distribute Portable Document Files (PDFs).

•        These reports were not a software application. They could only be used in conjunction with the ACS and SM consulting services, and they did not permit the end-user to do anything other than read or print the pages. No end-user manipulation or electronic investigation of the quarterly results was made possible by this development.

•        These reports also did not involve any enhancement to Plexus' delivery systems. They were simply re-designed report pages, the color scheme and formatting for which were more suitable to Inalytics, that were produced in PDF format. Plexus already had these reporting capabilities at the time of the acquisition. Accordingly, the $133,000 charge in 2003, see Hall Decl., Exh. D, Rows 173-7, 207-8 and 231, and the $108,000 charge for the Sponsor Monitor Executive Summary Report, see Hall Decl., Exh. D, Rows 198-202, both of which related to working on reformatting Plexus' reports for Inalytics, should not have been included as part of the Bank's $1,931,335 Plexus build figure.

11

#### (c)     Plexus Transition Reports and Infoco Quality Assurance

Also contained within the $1,931,135 amount the Bank claims it spent on the Plexus

build in 2003 are charges totaling $135,000 for Infoco Quality Assurance, see Hall Decl., Exh.

D, Rows 137-39 and Plexus Transition Reports, see Hall Decl., Exh. D, Rows 178-182. These

expenses in no way enhanced Plexus' platform, software applications or delivery systems. What

the Bank may have spent to check the quality of other, non-Plexus, products or to improve

existing Plexus paper reports, do not fall under ¶ 7.2 of the SPA.

As a result, when one subtracts the charges that did not enhance Plexus' platform,

applications or delivery systems from the Bank's $1,931,135 Plexus figure for 2003, for TCM

($371,790), the Inalytics Reports ($133,000  and $108,000) and Transition Reports and Infoco

Quality Assurance ($135,000), the total Bank spend in 2003 pursuant to ¶ 7.2 of the SPA did not

exceed $1,183,345.

#### (ii)     2004

##### (a)     Migration

When a similar analysis is done of the Bank's alleged 2004 Plexus spend, an even lower

number is arrived at. The Bank claims in its Summary that it spent $1,410,075 towards the

Plexus technology build in 2004. However, according to the Spreadsheet, approximately $1.1

million of that amount was spent to migrate some of Plexus' applications and systems hardware

from Long Beach, California to a 'data center' at JPMC's Brooklyn Metrotech site. See Hall

Decl., Exh. E, Row 111). This block of expense is coded as 41942 in the Spreadsheet. The

migration was purely for JPMC's convenience as a result of the Bank's harmful decision to

disband Plexus' technology development team in Long Beach and close that location.

The migration also had no positive impact on Plexus' revenue generation. The benefits,

if any, to this migration, would not have been noticed by Plexus' clients or prospects. Indeed, a

12

document distributed by Thomas Campfield of JPMC on December 19, 2003, entitled "INFOCO-dec-summary-5.ppt", see Adler Decl., Exh. J, shows a comparison of the hardware located in Long Beach and located in Metrotech and confirms that Plexus' hardware was on par with, or exceeded that of, Metrotech (where some servers still ran Windows NT). Further, a comparison of the Application Software Components installed at each location shows that Plexus' assets were no less useful than JPM's own. The migration also appears to have made the technology platform less stable. See Adler Decl., Exh. K. Accordingly, at best, the Bank spent a total of about $300,000 ($1,410,075 minus $1.1 million) between January 1, 2004 and August 31, 2004 pursuant to ¶ 7.2 of the SPA.

Finally, in the bottom box of the Summary the Bank becomes even more "creative" in its accounting. It seeks to add to the Plexus tech spend the salary, benefits ("S&B") and bonuses of Screen and Campfield. Screen's salary, however, is already included in the total Plexus dollars for '03 and '04 in the top box of the Summary and only a small portion of Campfield's time, in the range of approximately twenty (20%) to twenty-five percent (25%), was devoted to Plexus' technology build. Therefore, the Bank should have apportioned those costs. Moreover, the Bank included almost $2 million of charges for Plexus' L.A. Production Team. Those employees were involved in producing and collating Plexus' hard copy reports (the delivery system in place at Plexus at the time of the acquisition) and those employees did not work on, and had nothing at all to do with, enhancing Plexus' platform, applications or delivery system. Accordingly, at best, only a few hundred thousand dollars of charges from the bottom box of the Summary might be applicable to ¶ 7.2.

Plaintiffs' analysis of the Summary and the Spreadsheet shows a total spend of approximately $1.75 million ($1.183 million for 2003, approximately $300,000 for 2004 and

13

possibly a few hundred thousand for certain charges in the bottom box in the Summary). This amount is in-line with other Bank documents which, as noted above, admit that the Bank spent only between about $2 million and $3 million on Plexus' tech build.

## D.   The Bank's Breaches of ¶ 8.2 of the SPA and the Implied Covenant of Good Faith

In addition to its failure to make the agreed-upon technology investment in accordance with ¶ 7.2 of the SPA, the Bank failed to comply with ¶ 8.2 of the Agreement. It failed in various ways to do what was reasonably necessary to give Plaintiffs any shot at realizing the full value for their business in terms of the Earn-Out payments. For example, the Bank never funded research and development ("R&D") expenditures despite agreeing to contribute over $5 million during the Earn-Out Period. This resulted in no new products (and no new revenue relating to those products) being produced by Plexus. Almost immediately after the closing, the Bank imposed unilateral hiring freezes and cost-cutting measures. Moreover, in 2003 it fired Plexus' Head of Sales, Plaintiff Michael Keady, closed Plexus' main sales office located in New Jersey and, in November, 2003, fired Phinney, the person who had spearheaded the TCM business model. Soon thereafter Phinney was replaced with Avram Stein, who already also had responsibility for overseeing a larger, more profitable area of the Bank and who had little, if any, interest in, and no time to look after, Plexus and the related businesses that were to comprise TCM. See Adler Decl., Exh. K. In February 2004, Stein announced the closure of Plexus' technology development office in Long Beach, California and half of its employees were fired in April 2004 (and the remainder were terminated or reassigned soon thereafter), followed two months later by the termination of Plaintiff David Hall, the former President and CEO of Plexus. Thereafter, in 2005, the Bank terminated its relationship with Inalytics, Plexus' European sales force, and never replaced those salespeople.

14

These various events all contributed to the Bank's substantial breaches of ¶8.2 of the SPA and the breaches of covenant of good faith and fair dealing implied in the Agreement. The Bank has essentially admitted as such. A timeline included in a document the Bank drafted dealing with whether to sell or retain Plexus concedes that in the Fall of 2002 the Bank was "unable to execute technology development given inability to obtain approvals for hiring and bureaucratic processes". In that document that Bank also concludes that there was:

> [D]isruption from multiple organizational changes resulting in changing priorities, talent loss, idle time due to long rec approval. . . . Ultimately, the compounded effect of these factors has placed Istanbul (the code name for Plexus) in a position where it still lacks, after 2.5 years, the technology platform to effectively compete in the marketplace.

> [See Adler Decl., Exh. G.]

However, Plaintiffs are not seeking summary judgment as a result of this conduct.

Rather, Plaintiffs have an iron-clad, and factually undisputed, basis for summary judgment on their implied covenant claim. Only three years after the closing, and with two years remaining in the Earn-Out Period, the Bank sold Plexus to Investment Technology Group ("ITG"), Plexus' main competitor and the former number two player in the TCA industry. ITG merged Plexus into its other revenue producing operations so that it was impossible to determine the revenues Plexus generated for it after the sale.

At the time Plexus was sold to ITG, the Bank realized it would have liability to Plaintiffs under the SPA for the balance of the Earn-Out monies. However, the Bank concluded it was financially better off disposing of the business. As part of the "Plexus Takedown Costs" calculated by the Bank in relation to a "Sell Scenario", it included the "Unrealized Earn Outs" of $7.65 million which it also calculated, on a cash basis, would cost the Bank $8.031 million. See Adler Decl., Exh. L; see also Adler Decl., Exh. M, p. 8). The sale obviously precluded Plaintiffs from qualifying for any portion of the $6 million available under the SPA for 2006 and 2007 and

15

43187/0001-6427249v5

from receiving, based upon the cumulative revenue provisions, any Earn-Out monies they did not qualify for in previous years. ITG was careful to not assume this liability as part of the purchase of Plexus from the Bank and negotiated an indemnification clause, leaving the Bank fully exposed to this liability. See Adler Decl., Exh. M.

## LEGAL ARGUMENT

## I.   THE BANK FAILED TO SPEND ANYTHING CLOSE TO THE $6 MILLION REQUIRED BY THE SPA AND, THEREFORE, PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON THEIR BREACH OF CONTRACT CLAIM.

In order to recover for a breach of contract, a plaintiff must demonstrate: "[1] the

existence of a contract, [2] plaintiff's performance under the contract, [3] defendant's breach of

that contract, and [4] resulting damages."[9]  JP Morgan Chase v. J.H. Elec. of New York, Inc.,

893 N.Y.S.2d 237, 239 (2d Dep't 2010); see also Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,

392 F.3d 520, 525 (2d Cir.2004).  When considering a motion for summary judgment in a breach

of contract action, a court must determine if there are legitimate issues of fact with regard to

these aforementioned elements such that the dispute cannot be resolved as a matter of law.  See

e.g. Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan, 7 F.3d 1091,

1094 (2d Cir. 1993).  As set forth herein, there can be no dispute that the Bank breached ¶¶ 7.2

and 8.2 of the SPA, a contract under which Plaintiffs fully performed.

The language of the SPA expressly indicates that the Bank agreed to invest not less than

$6 million for the purpose of enhancing Plexus' "technology platform and [software]

applications and delivery systems." (See ¶ 7.2 of the SPA).  Where, as here, a party

contractually obligates itself to invest a certain sum of money and then does not perform that

obligation, the aggrieved party will be entitled to recover for breach of contract.  See e.g., Stern

v. Premier Shirt Corp., 260 N.Y. 201, 204-05 (1932) (finding that a party could recover profits

lost to him as a result of defendants' failure to finance his business); Zelazny v. Pilgrim Funding

Corp., 244 N.Y.S.2d 810, 816 (D.C.N.Y. 1963) (failure to provide contracted for funding allows

"one who has suffered damage as a result of [the] breach of such contract [to] recover damages. .

---

[9] Plaintiffs have moved for summary judgment only as to liability, not damages.

17

. .") The undisputed facts of this case, as evidenced by Defendant's own documents, confirm that the Bank spent at best $3.7 million, substantially less than the required minimum of $6 million during the twenty-four (24) month period after closing. It is, therefore, clear that the Bank has breached the express terms of the SPA for which the Plaintiffs are entitled to recover damages.

In support of its meritless attempt to avoid its contractual obligations, the Bank has compiled a Spreadsheet which reflects its argument that it allegedly spent over $9 million on Plexus' technology build, yet this amount includes sums which clearly do not fall within the purview of the SPA and which reflect a misrepresentation of the SPA's scope by the Bank. In interpreting the SPA, this Court's primary objective should be to give effect to the intent of the contracting parties "as revealed by the language they chose to use." Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992). While parties may dispute the meaning of specific contractual clauses, the Court's "task is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" Sayers, supra, 7 F.3d at 1094 (citing Williams Press, Inc. v. New York, 37 N.Y.2d 434, 440 (1975)). Here, each of the three terms at issue, Plexus' technology platform, applications and delivery systems" are subject to only one meaning and, in this regard, "[p]arties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." Id. Moreover, as detailed above, ¶ 7.2 of the SPA requires the Bank to invest $6 million to for the purpose of "enhancing the Company's (Plexus') existing technology platform and applications and delivery system." (Emphasis added.) It is, therefore, curious that the total cited by the Bank in its Spreadsheet is comprised of expenditures on Valued Holdings, Trade Starr, Efritz, GMRD and TCM products which did not enhance Plexus or generate any revenue for it.

18

In addition to its failure to make the agreed-upon technology investment in accordance
with ¶ 7.2 of the SPA, the Bank failed to comply with ¶ 8.2 of the Agreement, which required the
Bank to do what was reasonably necessary to give Plaintiffs an opportunity to be paid the full
value for their business in terms of the Earn-Out payments. The Bank's decision to sell the
business during the Earn-Out Period runs afoul of its contracted obligation in ¶ 8.2.

There is no dispute that the SPA is a binding contract between the Bank and Plaintiffs. It
is also undisputed that while the Plaintiffs fully performed under the terms of the SPA, that the
Bank failed to do the same by failing to make the agreed upon investment in Plexus' technology
and by selling the business during the Earn-Out Period. As such, there can be no doubt that
Plaintiffs are entitled to recover for the Bank's breaches of contract, and that summary judgment
in favor of Plaintiffs is appropriate.

## II.     THE BANK'S SALE OF PLEXUS DURING THE EARN-
         OUT PERIOD ALSO CONSTITUTES A BREACH OF THE
         IMPLIED COVENANT OF GOOD FAITH AND FAIR
         DEALING.

In addition to its failure to fund Plexus' technology build  in accordance with the SPA,
see Point I, supra, the Bank's sale of Plexus during the earn-out period deprived plaintiffs of
receiving the benefit of their bargain and constituted a breach of the implied covenant of good
faith and fair dealing.

Under New York law, all contracts imply a covenant of good faith and fair dealing in the
course of performance. See Security Pacific National Bank v. Evans, 878 N.Y.S.2d 732, 733-34
(1st Dep't 2009) (citing Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 389 (1995)); see
also J.P.Morgan Chase Bank, N.A. v. IDW Group, LLC, 2009 WL 321222, *4 (S.D.N.Y. Feb. 9,
2009) (citing M/A-Com Security Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)). This
covenant embraces a pledge that "neither party shall do anything which will have the effect of

19

destroying or injuring the right of the other party to receive the fruits of the contract." Dalton, 87 N.Y.2d at 389 (citing Kirke La Shelle Co. v. Armstrong Co., 263 N.Y. 79, 87 (1933)). That is, "[w]hile the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship," Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 304 (1983), they do encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69 (1978) (citing 5 Williston, Contracts § 1293, at 3682 (Rev. Ed. 1937)).

The most obvious example of the Bank's breach of the implied covenant of good faith and fair dealing is its decision to sell Plexus during the Earn-Out Period.[10] On January 3, 2006, with still two years left on the Earn-Out, the Bank sold Plexus to one of its competitors. It is well-settled law that "[a]n agreement for the rendition of service to a business implies a promise that the party to whom the services are rendered will continue to remain in business." A.W. Fiur Co., Inc. v. Ataka & Co., Ltd., 422 N.Y.S.2d 419, 421 (1st Dep't 1979) (citing 407 East 61st Garage v. Savoy Fifth Ave. Corp., 296 N.Y.S.2d 338 (1968)). "Such a promise will be implied particularly where the other party has undertaken burdens or obligations in expectation of and in reliance upon the promisor's continued activity." Id.

In A.W. Fiur Co., supra, 422 N.Y.S.2d at 419, the plaintiff, a United States retailer, had contracted to sell the products of defendant, a Japanese fabric manufacturer. Under the terms of the agreement, plaintiff was to accept orders for defendant's products which the defendant could reject "for any reason whatsoever." Id. at 422. After the plaintiff refused defendant's request to change the terms of the parties' contract, defendant stopped distributing products in the United States, thus depriving plaintiff of the ability to sell the products. Plaintiff sued for breach of

---

[10] As noted in the Statement of Facts, the Bank took many other actions which interfered with Plaintiffs' rights under the SPA. That egregious conduct, in violation of the covenant of good faith and fair dealing, is not the subject of this motion.

20

contract. Defendant argued that it had a contractual right to refuse any orders and, therefore, could end its relationship with plaintiff at any time. The Appellate Division disagreed, holding that a broad contractual right does not allow a party to arbitrarily deprive the other of the benefit of its bargain. Id. at 422. Specifically, the court held that "[a]n agreement for the rendition of service to a business implies a promise that the party to whom the services are rendered will continue to remain in business."

Here, plaintiffs clearly would not have sold their interests in Plexus if the Bank had the right during the Earn-Out Period to sell the business and deprive them of a large portion of the purchase price. It defies logic, and black letter law, to assume the Bank could do away with its substantial exposure under the SPA simply by selling the business before the time period expired for Plaintiffs to achieve the revenue targets. Since the Bank was contractually obligated to make Earn-Out payments to Plaintiffs if certain revenue targets were met, there must also be an implied obligation that the Bank will continue to own Plexus during that time period. To hold otherwise would be to deprive plaintiffs of the benefit of their bargain, and would read good faith and fair dealing out of the terms of the SPA.

By selling the business during the Earn-Out Period, JPMC prevented Plaintiffs from performing and, thus, breached the implied covenant of good faith and fair dealing. Grad v. Roberts, 248 N.Y.S.2d 70 (1964) (in every contract there is an implied undertaking to not do anything to prevent the other party from carrying out the agreement); see also Tripodo v. Chase Manhattan Bank, 576 N.Y.S.2d 760, 763 (N.Y. Civ. Ct. 1991) (citing Grad v. Roberts, supra). Moreover, where a defendant prevents full performance of the conditions set forth in a contract, it may not rely on plaintiff's failure to achieve those conditions "to excuse its own non-performance." Id. (citing Bass v. Sevits, 433 N.Y.S.2d 245 (3d Dep't 1980). Indeed, it is well-

21

settled that "[a] change in the method of business operations during the term of a contract, where such change prevents rendition of the services by the other party to the contract, constitutes a breach of contract, importing damages." A.W. Fior, supra, 422 N.Y.S.2d at 423 (citing 407 East 61st Garage, supra, West v. Weir & Barte, Inc. v. Mary Carter Paint Co., 267 N.Y.S.2d 29, 34 (1st Dep't 1966).

In the instant matter, there can be no doubt that the Bank made the ultimate change in the method of business operations by selling the business outright during the term of the SPA, and that change prevented Plaintiffs from receiving the fruits of the contract. The Bank's decision is the very essence of bad faith and it cannot escape liability for the Earn-Out payments as itself recognized when deciding whether to sell to ITG, despite there being no provision in the SPA specifically precluding the sale of the business.[11]

## III.   BASED ON THE UNCONTROVERTED FACTS PRESENTED, SUMMARY JUDGMENT IS APPROPRIATE.

Summary judgment is appropriate where no genuine issue of material fact exists. D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), cert. denied, 524 U.S. 911 (1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is 'no genuine issue for trial.'" Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). "There is no issue for trial unless

---

[11] The Bank has previously argued to this Court that Plaintiffs could have included a provision in the SPA precluding the Bank from selling Plexus during the Earn-Out Period, but such an argument turns the covenant of good faith and fair dealing on its head. By agreeing to pay Plaintiffs for Plexus based upon revenues generated by the business during the five year period post-closing, the only reasonable assumption Plaintiffs could have made was is that the Bank would continue to operate the business during that timeframe to enable Plaintiffs the opportunity to ear the balance of the purchase price. If the Bank wanted the right to sell short of five years post-closing, it, and not Plaintiffs, should have insisted upon including such a term in the SPA or, by operation of law, the covenant of good faith and fair dealing would be implied to preclude the Bank from depriving Plaintiffs of the fruits of their contract.

22

there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505 (1987). The Second Circuit has held that a "moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-23 (2d Cir. 1994).

In the instant matter, Plaintiffs have asserted claims of breach of contract and breach of the implied covenant of good faith and fair dealing against the Bank arising from the Bank's conduct following the execution of the SPA. For the reasons set forth above, there is no legitimate dispute concerning the Bank's failure to spend anywhere close to the $6 million required under the SPA. Likewise, there can be no dispute that the Bank sold Plexus after only three years of the five year Earn-Out Period. Accordingly, these undisputed facts entitle Plaintiffs to summary judgment as to liability on their claims for breach of contract (see Point I, supra) and breach of the implied covenant of good faith and fair dealing (see Point II, supra).

23

## CONCLUSION

For all of the foregoing reasons, summary judgment as to liability should be granted in

favor of Plaintiffs with respect to their claims for breach of contract and breach of the implied

covenant of good faith and fair dealing.

DATED: New York, New York
      April 16, 2010

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Plaintiffs, Wayne Wagner,
Lawrence Cuneo, Mark Edwards, David L. Hall,
Cathleen S. Screen, personal representative of the
Estate of Ian Screen, Steven Glass, Regina M.
Keady, executrix of the Estate of Michael Keady,
Tera R. Fead and Regina Miller

By: */s/ Steven I. Adler*

   Steven I. Adler (SIA 7573)
   Jason R. Melzer (JRM 7941)
   Warren A. Usatine (WAU 1187)
   Cole, Schotz, Meisel,
   Forman & Leonard, P.A.
   A Professional Corporation
   900 Third Avenue, 16th floor
   New York, NY 10022-4728
   (212) 752-8000

43187/0001-6427249v5