UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WAYNE WAGNER, et al.,

               Plaintiffs,

     v.

JP MORGAN CHASE BANK,

               Defendant.

No. 06 Civ. 3126 (RJS)(THK)

ECF Filed

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

SATTERLEE STEPHENS BURKE & BURKE LLP
James J. Coster
Joshua M. Rubins
Glenn C. Edwards

230 Park Ave., 11th Floor
New York, NY 10169
(212) 818-9200
(212) 919-9606/7 (fax)

*Attorneys for Defendant JP Morgan Chase Bank*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT ..........................................................................1

BACKGROUND ....................................................................................................3

ARGUMENT...........................................................................................................5

    I.      TO SUCCEED ON THEIR MOTION, PLAINTIFFS MUST
             SUBMIT EVIDENCE SUFFICIENT TO COMPEL A VERDICT
             IN THEIR FAVOR ..................................................................................5

    II.     JPMC SPENT AT LEAST $6 MILLION PURSUANT TO § 7.2 .........................6

          A.     The Meaning of § 7.2 Is Unambiguous, and There  Is No
                 Support for Plaintiffs' Strained Readings ....................................6

              1.       Plaintiffs' Interpretation Is Unsupportable .....................................6

              2.       § 7.2 Spending Need Not Be Capitalized ........................................8

          B.     The Evidence Shows Clearly That JPMC Spent Well Over $6M .............8

              1.       The Hall Declaration Should Be Stricken or Disregarded..............9

              2.       The "Summary" Spend Document Is Not Exhaustive....................9

              3.       Plaintiffs Discount Large Expenditures With No Evidence ..........10

              4.       Other Expenditures Clearly Were for the Purpose of
                     Enhancing Plexus' Technology ....................................................13

                    a.     TCM/GMRD.....................................................................14

                    b.     Migration From Long Beach to Brooklyn .............................15

                      c.     Inalytics, Quality Assurance, Transition ...............................17

    III.    JPMC'S SALE OF PLEXUS TO ITG DID NOT BREACH THE SPA...............18

          A.     Plaintiffs Have Shown No Breach of the Implied
                 Covenant of Good Faith.............................................................18

           B.     Plaintiffs Have Not Shown Any Implied-in-Fact
                 Obligation Not to Sell ...............................................................21

           C.     There Is at Least a Triable Issue as to Waiver or Estoppel ......................25

CONCLUSION ......................................................................................................25

804190_3

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*407 E. 61st St. Garage, Inc. v. Savoy Fifth Ave. Corp.*,
  23 N.Y.2d 275, 296 N.Y.S.2d 338 (1968) ............................................................21, 23, 24

*A.W. Fiur Co. v. Ataka & Co.*,
  71 A.D.2d 370, 422 N.Y.S.2d 419 (1st Dep't 1979) ......................................................21

*Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*,
  155 F.3d 612 (2d Cir. 1998) .......................................................................................5

*Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*,
  650 F. Supp. 2d 314 (S.D.N.Y. 2009) ...........................................................................18

*DeBlasio v. Merrill Lynch & Co.*,
  2009 WL 2242605 (S.D.N.Y. July 27, 2009) ............................................................19, 20

*Flaherty v. Filardi*,
  2007 WL 163112 (S.D.N.Y. Jan. 24, 2007) ....................................................................9

*Hollander v. Am. Cyanamid Co.*,
  172 F.3d 192 (2d Cir. 1999) .......................................................................................9

*Laugh Factory, Inc. v. Basciano*,
  608 F. Supp. 2d 549 (S.D.N.Y. 2009) ...............................................................22, 23, 24

*Lotz v. Charles Crosby & Son, Inc.*,
  2009 WL 2156916 (N.D.N.Y. 2009) ...........................................................................25

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.*,
  56 N.Y.2d 175, 451 N.Y.S.2d 663 (1982) ....................................................................25

*Neuman v. Pike*,
  591 F.2d 191 (2d Cir. 1979) .....................................................................................23

*Reiss v. Fin. Perf. Corp.*,
  97 N.Y.2d 195, 738 N.Y.S.2d 658 (2001) ....................................................................22

*Rowe v. Great Atl. & Pac. Tea Co.*,
  46 N.Y.2d 62, 412 N.Y.S.2d 827 (1978) ...........................................................20, 22, 23, 24

*Shah v. Kuwait Airways Corp.*,
  653 F. Supp. 2d 499 (S.D.N.Y. 2009) ...........................................................................5

804190_3

*U.S. Bank v. Ables & Hall Builders*,
    2010 WL 996761 (S.D.N.Y. 2010) ................................................................6

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470, 775 N.Y.S.2d 765 (2004) ....................................................22

*Zellner v. Summerlin*,
    494 F.3d 344 (2d Cir. 2007) ........................................................................5

## STATUTES AND RULES

Fed. R. Civ. P. 56(e) ..............................................................................................2, 9

## MISCELLANEOUS

*Dictionary.com Unabridged* (Random House 2010) ...............................................7

*McGraw-Hill Dictionary of Electrical and Computer Engineering* (McGraw-Hill 2004) .............7

*Microsoft Computer Dictionary* (5th ed. 2002) ....................................................7

*Webster's Third New Int'l Dictionary* (unabridged 2002) ................................7, 16

*Wiley GAAP 2010* (Epstein, *et al.*, eds., 2009) ...................................................8

## PRELIMINARY STATEMENT

In its opening brief on its own motion for summary judgment ("JPMC Br."), JPMC demonstrated conclusively that there is no genuine issue as to whether JPMC breached the Stock Purchase Agreement ("SPA") that is at the heart of this controversy.   JPMC submitted substantial evidence to show that it had at all times acted in good faith, thus precluding any claim for a breach of the implied covenant of good faith and fair dealing. JPMC Br. at 5-12.   JPMC also submitted overwhelming record evidence that it not only spent the $6 million on upgrading technology as required by § 7.2 of the SPA, but in fact millions more (over $9 million total).   *Id.* at 12-13.   And JPMC showed that plaintiffs cannot demonstrate that JPMC's alleged breaches caused them any damage.

At the same time, plaintiffs submitted their own motion for summary judgment, asserting that they are entitled to judgment as a matter of law (on liability only) with respect to JPMC's technology expenditures, and also asserting (in a claim not made in their Complaint) that JPMC's sale of Plexus to ITG at the beginning of 2006 was itself a breach of the SPA.   In choosing to move for summary judgment, plaintiffs, as the ones who bear the burden to prove breach of contract, set themselves an extremely difficult task, for they must not merely present evidence that would *permit* the Court to find a breach, but that (even before JPMC's own evidence is considered) would *compel* such a finding.

It will not be a difficult task for the Court to determine that plaintiffs have abjectly failed to meet this standard.   Indeed, if anything, plaintiffs' submission provides compelling confirmation that there is no record evidence to support their claims of a contract breach (even putting aside causation, which plaintiffs' motion does not address) and that JPMC's motion should be granted.

The contrast between JPMC's extensive evidence supporting its own motion (where it carries a far lesser burden) and plaintiffs' motion papers could not be more striking.   Plaintiffs' "evidence" almost entirely relies upon the declaration of plaintiff David Hall.   His declaration, however, neither claims to be based on personal knowledge nor gives this Court any basis to

believe that this is true (as required by Fed. R. Civ. P. 56(e)). It is, moreover, copied almost verbatim from the Memorandum of Law submitted by plaintiffs' counsel – and both documents at times lift whole passages verbatim from the report of plaintiffs' expert witness (which, curiously enough, they do *not* submit). The actual admissible evidence submitted by plaintiffs in ostensible support of a finding in their favor is, in short, negligible.

The inadequacy of plaintiffs' showing does not end there, however. With regards to JPMC's spending, plaintiffs assume – with no evidence whatsoever – that a single spreadsheet produced during discovery represents JPMC's "contention" as to the entirety of its technology spend. This spreadsheet, it should be noted, by itself shows a spend of well over $6 million, but JPMC does not suggest, and never has suggested, that it was exhaustive. Moreover, in their attempt to claim that JPMC spent less than the $6 million required, plaintiffs rely almost entirely on wholly unsupported assertions about JPMC's expenditures – most contradicted by the record – or on interpretations of SPA § 7.2 that are at odds with the provision's plain language.

As for the sale to ITG, plaintiffs can point to no provision of the SPA that bars such a sale, and they have utterly failed to provide any basis for implying such a term. They make no credible argument (and provide no admissible evidence) that a restriction on JPMC's right to sell the company was necessary to make the Plexus acquisition transaction a reasonable one, nor even that the sale in any way actually interfered with plaintiffs' rights under the contract. Indeed, it was plaintiffs themselves who first suggested that JPMC sell its Plexus stock to another company. It was only after careful analysis – analysis that plaintiffs participated in – that JPMC concluded that such a sale would be best for both JPMC and Plexus. JPMC thus did not breach any implied obligations.

Plaintiffs' submission, in short, is grossly inadequate to compel a finding in their favor on these claimed breaches and, indeed, could not even *permit* a finding so as to create a triable issue in their own favor. JPMC is confident that, when examined in light of its own summary judgment submission, there is no genuine issue as to either JPMC's compliance with its § 7.2 spend obligations or whether it breached any implied obligation by selling Plexus to ITG.

804190_3

Summary judgment on these issues is warranted for JPMC, not plaintiffs.

Finally, as JPMC amply demonstrated on its own summary judgment motion, it is not in fact necessary to reach either of these two issues. Plaintiffs cannot establish with any certainty that a breach by JPMC – even if they could prove one – caused them any damages. JPMC Br. at 13-24. Absent their ability to meet this burden, then, summary judgment for JPMC is warranted on this ground alone and, *a fortiori*, plaintiffs' own motion must be denied.

## BACKGROUND

The general history of the Plexus/JPMC relationship was recounted in detail in JPMC's opening brief and its Statement of Material Facts ("JPMC SMF"). JPMC Br. at 1-5. This memorandum will only briefly elaborate on two aspects of that history most relevant to the two issues raised by plaintiffs' motion: (1) the history of JPMC's spending on Plexus technology upgrades; and (2) the eventual sale of Plexus, at the beginning of 2006, to ITG.

The Plexus acquisition transaction closed on or about August 28, 2002, at which time Plexus became a wholly owned subsidiary of JPMC and a part – indeed, the largest part by far – of its InfoCo business unit. Immediately, Thomas Campfield turned his programmers and other staff in Brooklyn to working on projects to enhance Plexus' technology. Campfield Decl. ¶ 11. And, of course, the tech development work that was already ongoing by Plexus' staff in Long Beach and Los Angeles didn't stop, it kept going, but now JPMC was paying the bills. *Id.* Thus, there can be no dispute that, as Campfield stated, there was work performed in 2002 – costing at least $ 723,000, *see* JPMC Br. at 13 – that counts towards JPMC's § 7.2 spend obligation.

For 2003 and 2004, however, Plexus tech development work was folded into the more formal JPMC project approval process. In late 2002, John Phinney (then head of InfoCo) presented a proposal to the JPMC Investment Committee for a Plexus/InfoCo technology upgrade, which ultimately resulted in an approval for 2003 of $3.0 million. JPMC SMF ¶¶ 119-20. This amount represented the *additional*, discretionary budget to be dedicated to InfoCo tech development above and beyond the base expenditures for Plexus and InfoCo, which did not require Investment Committee approval. In particular, expenses such as compensation for

3

salaried management (Campfield and his staff, and senior Plexus personnel such as technology chief Ian Screen, Wayne Wagner, Larry Cuneo, Mark Edwards, and David Hall) or overhead and operating expenses were not considered part of the discretionary budget approved by the Investment Committee. Yet it was of course understood that much of the time for these persons would be devoted to Plexus technology enhancement; i.e., there was nothing in the Investment Committee's approval of $3.0 million that prevented JPMC from ultimately spending *more* than this amount by its devotion of "base" resources to the project (as indeed happened). The committee again approved $3.0 million in discretionary technology spend for 2004.

Campfield, together with Screen, oversaw the Plexus tech development work and instructed his staff, in particular Lena Chang, to track expenditures so as to ensure that he did not exceed his budget. The time of programmers in Brooklyn and Long Beach, as well as technology expenditures to outside vendors, were tracked against the discretionary budget, but (consistent with the purpose of that budget) the time of management, senior staff, and administrative personnel were not; neither was the time of personnel in Los Angeles tracked against the discretionary budget, because they traditionally worked primarily on day-to-day operations (but were now being called upon to assist with the technology upgrade). In addition to the discretionary budget allotted for 2003 by the Investment Committee, it was also decided that up to $900,000 of base or "business as usual" (BAU) budget for the Plexus Long Beach office could be added to the tech development project. JPMC SMF ¶¶ 121-34.

In late 2004, Avi Stein replaced John Phinney as head of InfoCo. At this time Stein made an assessment as to whether Plexus should remain a part of JPMC and he concluded that the answer was yes. *Id.* ¶¶ 101-02. In early 2005, however, Wayne Wagner, with the approval of Larry Cuneo – Wagner and Cuneo representing the two most senior members of Plexus management – went to Stein and his superiors and asked that JPMC consider selling Plexus, because they felt that Plexus was not thriving in the JPMC environment. *Id.* ¶¶ 103-06. Indeed, Wagner and other plaintiffs had concluded in 2003 and 2004 that there was essentially no chance of Plexus achieving the longer-term revenue goals needed for them to be paid earnouts for 2005

4

and beyond.  *Id.* ¶¶ 20-27. Stein then directed an extensive analysis of the pros and cons of retaining or selling Plexus – an analysis that plaintiffs participated in.  *Id.* ¶¶ 107-08; Adler Ex. B.  Ultimately, it was decided that if a buyer at a sufficient price could be found, it would be more advantageous for both Plexus and JPMC to sell the company, and that is precisely what happened, as JPMC sold all of its stock in Plexus to ITG (the leading TCA provider) in a sale that became effective January 3, 2006.

<u>ARGUMENT</u>

## I.    TO SUCCEED ON THEIR MOTION, PLAINTIFFS MUST SUBMIT EVIDENCE SUFFICIENT TO COMPEL A VERDICT IN THEIR FAVOR

In attempting to obtain summary judgment, plaintiffs have created for themselves a particularly difficult task.  Because – as they agree, *see* Pls.' Br. at 17 – plaintiffs bear the burden to prove the elements of breach of contract, in order to obtain summary judgment, plaintiffs' "own submissions must entitle [them] to judgment as a matter of law."  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 617-18 (2d Cir. 1998); *Shah v. Kuwait Airways Corp.*, 653 F. Supp. 2d 499, 505 (S.D.N.Y. 2009).  That is, it is not sufficient for plaintiffs' evidence in support of their motion merely to *permit* a verdict in their favor; their evidence must be so incontrovertible that, even viewed in the light most favorable to JPMC (as, for purposes of plaintiffs' motion, it must be), it *compels* a finding of liability.  *See Albee Tomato*, 155 F.3d at 618; *Zellner v. Summerlin*, 494 F.3d 344, 370-71 (2d Cir. 2007).

Plaintiffs' "evidence" does not remotely approach this level of compelling persuasiveness.  Indeed, even without considering the substantial evidence submitted by JPMC on its own motion and in opposition here, plaintiffs' evidence is so lacking in foundational support and so dependent upon conclusory assertions that it could not even *permit* a finding that it is more likely than not that JPMC breached the SPA.  When JPMC's evidence *is* considered, however, it is patent that plaintiffs have not, and cannot produce sufficient evidence to even sustain the possibility of a finding in their favor.  Thus, summary judgment for JPMC is warranted and, *a fortiori*, plaintiffs' own motion must be denied.

5

## II.     JPMC SPENT AT LEAST $6 MILLION PURSUANT TO § 7.2

Plaintiffs' attempt to demonstrate that JPMC unquestionably failed to spend the $6 million required under SPA § 7.2 starts with a spreadsheet that they claim – *citing not a single piece of admissible evidence* – represents (and was intended to represent) all of the spending JPMC can claim credit for in assessing whether it met its § 7.2 obligation.  They then proceed to subtract from the totals in that spreadsheet items that they claim are not properly counted – in some cases based upon strained and untenable readings of § 7.2, in some cases based upon conclusory and unsupported assertions about the nature of the expenditures, and in some cases, for no discernible reason whatsoever.  The weakness of plaintiffs' support for these calculations makes clear that summary judgment for JPMC, not plaintiffs, is the required result.

### A.     The Meaning of § 7.2 Is Unambiguous, and There Is No Support for Plaintiffs' Strained Readings

The starting point for analyzing JPMC's obligations under § 7.2 is, naturally, the text of the provision itself – free of the adulterations that plaintiffs repeatedly insist on introducing:

> Buyer will spend not less than six million ($6,000,000) dollars during the twenty-four month period commencing on the Closing Date to [sic] for the purpose of enhancing the Company's existing technology platform and applications and delivery systems used by the Company and may spend up to fifteen million dollars ($15,000,000) in the aggregate in such twenty-four month period.

SPA § 7.2.[1]   (Here, "Buyer" is JPMC, and "the Company" is Plexus.)   Read in the straightforward, plain-meaning manner required by New York law, *see, e.g.*, *U.S. Bank v. Ables & Hall Builders*, 2010 WL 996761, at *7 (S.D.N.Y. 2010), there is nothing ambiguous about this text: *any* expenditure by JPMC during the relevant period that is made "for the purpose of enhancing" either Plexus' existing technology platform, or the applications or delivery systems used by Plexus, is creditable towards the $6 million obligation.

### 1.     Plaintiffs' Interpretation Is Unsupportable

Plaintiffs offer up their interpretation of § 7.2 – or rather, what is the interpretation of

---

[1] Plaintiffs repeatedly insert "[software]" before the word "applications," as if this were merely a rearrangement of the actual text.  *See, e.g.*, Pls.' Br. at 2, 5.  The precise work plaintiffs believe this emendation to accomplish is not clear, but what is clear is that the word "software" appears nowhere in § 7.2, much less as a modification of the word "applications."

804190_3

their technology expert, Joseph Rosen, although curiously enough his report opining on this interpretation is not offered by plaintiffs.[2]  *See* Pls.' Br. at 5.  In any case, this "interpretation" is simply a conclusory assertion, completely bereft of any support.  For example, plaintiffs do not cite to dictionaries or any reliable reference sources as to the plain meaning of the terms in § 7.2.

These terms do, however, have well-recognized plain meanings.  A "platform" is "the hardware system and the system software used by a computer program."  *McGraw-Hill Dictionary of Electrical and Computer Engineering* (McGraw-Hill 2004) (Ex. 181).[3]  There is nothing in the term that limits it to *software* programs that performed the TCA analysis and created the reports for Plexus consultants.  An "application" is "A computer program that performs a specific task, for example a word processor, a Web browser, or a spreadsheet."  *Id.*[4]  Again, contrary to plaintiffs' assertion, nothing in the term limits it to applications *used by Plexus clients* – indeed, § 7.2 refers to "applications ... used by Plexus."  Thus it is quite clear that the legacy software that performed the TCA analysis and created reports are in fact *applications* (although software that was to be run by the clients themselves would of course also qualify).  Finally, a "delivery system" is  "any means or process for conveying a product or service to a recipient," *Dictionary.com Unabridged* (Random House 2010)(Ex. 179), thus referring, as plaintiffs do not appear to dispute, to the systems by which TCA analysis results are delivered to Plexus customers.

Applying the plain meaning of the terms in § 7.2, then, it actually becomes quite clear that § 7.2's scope is comprehensive as to all aspects of Plexus' technology, from its hardware and operating systems to its software applications to the means by which results were delivered

---

[2] Rosen is not qualified under *Daubert* to opine on the meaning of terms in a contract, as he has no legal expertise and such testimony is, in any case, improper.  *See* JPMC Br. at 21 n.19.

[3] *See also Microsoft Computer Dictionary* (2002)(Ex. 180) ("In everyday usage, the type of computer or operating system being used."); *Webster's Third New Int'l Dictionary, Unabridged* (2002) (Ex. 178)("a computer architecture that uses a particular operating system.").

[4] *See also Microsoft Computer Dictionary* ("A program designed to assist in the performance of a specific task, such as word processing, accounting or inventory management"); *Webster's Unabridged* ("a program (as a word processor or spreadsheet) that performs one of the important tasks for which a computer is used").

7

to clients.  In other words, rather than agree to spend $6 million on any particular technology project – as plaintiffs assert (with no evidence) – JPMC agreed that it would spend $6 million on enhancing Plexus' technology, period, leaving the specifics to be determined once JPMC, in consultation with Plexus, determined where the greatest need was.

### 2.     § 7.2 Spending Need Not Be Capitalized

Plaintiffs repeatedly state (or imply) that only capital expenditures by JPMC count towards the $6 million total.  *See, e.g.*, Pls.' Br. at 6 (referring to § 7.2 as JPMC's "capital expenditure promise").  But this limitation is found nowhere in the text of § 7.2.  Rather, *any* money "spen[t]" by JPMC for the appropriate purpose – regardless of its accounting treatment – is appropriately credited towards the total.

In a footnote, plaintiffs argue a slightly different tack: that "All of the Bank's expenses related to the Plexus technology build should have been capitalized considering this project was to last well in excess of one year." Pls.' Br. at 6 n.7.  This assertion is unsupported by any evidence – either as to accounting principles in general or JPMC's in particular.  It is also a gross oversimplification of the accounting rules regarding capitalization of software and technology expenditures.  As JPMC's CFO, Kevin Brewer, testified at his deposition, the guidelines for capitalization are complex and only a fraction of IT expenditures at JPMC are capitalized.  *See* Brewer 185-88.[5]  Indeed, certain expenditures, such as salaries for managers, would never have been capitalized, yet the time that they spent on enhancing Plexus' technology clearly falls within § 7.2.  Brewer 185; Cuneo 121-23.

### B.     The Evidence Shows Clearly That JPMC Spent Well Over $6M

As for the amounts spent, plaintiffs' purported "evidence" is largely inadmissible, in some cases nonexistent, and in all respects utterly unpersuasive.  Plaintiffs' submission – which, presumably represents their strongest case – not only falls far short of compelling a finding that they have proven JPMC's breach, but is inadequate to counter the overwhelming evidence JPMC

---

[5] *See also* Epstein, et al., *Wiley GAAP 2010* (2009) (Ex. 177) 516-20, 1191-94, for a discussion of the requirements for capitalizing software development expenditures.

has submitted (and supplements herein) showing a § 7.2 spend of substantially more than $6 million.  This fact is hardly surprising, given the fact that plaintiffs did nothing to track or monitor spending on technology improvements at the time.  *See, e.g.*, Cuneo 126; Miller 18-24.

## 1.  The Hall Declaration Should Be Stricken or Disregarded

As an initial matter, plaintiffs rely heavily on the declaration of plaintiff David Hall.  This declaration, however, fails to meet the basic requirements of Rule 56(e), which states that all affidavits "must be made on personal knowledge" and "show that the affiant is competent to testify on the matters stated."  The closest nod to meeting this requirement is Hall's statement about his former position as Plexus President/CEO.[6]  Hall Decl. ¶ 1.  But nowhere does he state facts from which it could be presumed that this position – for the limited time he held it – would afford him personal knowledge of most of the facts key to plaintiffs' motion.  There is certainly no reason to believe that Hall had detailed knowledge of the expenditures made by JPMC, the accounting of those expenditures, what work was accomplished by those expenditures and how that work may or may not have enhanced Plexus' technology.  The facial inadequacy of the Hall Declaration should require its striking, but at the very least the portions for which no apparent foundation exists must be disregarded.  *See Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999); *Flaherty v. Filardi*, 2007 WL 163112, at *4-5 (S.D.N.Y. 2007).[7]

## 2.  The "Summary" Spend Document Is Not Exhaustive

Plaintiffs' case for JPMC's breach of the § 7.2 spend obligation is based entirely upon the premise that a summary prepared by JPMC of some of its Plexus-related expenditures (Hall Decl. Ex. B) represents "the amount the Bank contends it spend towards enhancing Plexus' technology platform, applications and delivery systems."  Pls.' Br. at 8.  Taking this spreadsheet

---

[6] Even there, Hall only held this position until February 2003.  *See* Hall 8.  At that point, Hall's responsibility became to "act as a bridge" between the client consultants and the tech development team.  *Id.* 9-10.  Hall was terminated from Plexus altogether in June 2004.  *Id.* 10.

[7] It also cannot escape notice that Hall's declaration is almost entirely lifted *verbatim* from the plaintiffs' memorandum of law.  The Second Circuit in *Hollander* affirmed the striking of an affidavit that was "riddled with admissible hearsay, conclusory statements and arguments, and information clearly not made on the affiant's personal knowledge" and "more resemble[d] an adversarial memorandum than a *bona fide* affidavit."  172 F.3d at 198.

9

as the ceiling, plaintiffs then begin subtracting from this summary (or, in some cases, simply ignoring portions of the summary itself) to arrive at what they claim is the actual § 7.2 spend total.  *Id.* at 9-14.  Neither leg of this analysis can support the weight plaintiffs would place on it.

First and foremost, while JPMC agrees that the expenditure numbers represented in Hall B are (with some exceptions) generally accurate – they are, in fact, largely taken from one of the spreadsheets that JPMC itself included in its moving papers on summary judgment, *see* Audenino Decl. Ex. A – JPMC has  never "contended" that the spreadsheets in Hall Ex. B represent an exhaustive catalog of § 7.2-related expenditures. Plaintiffs submit *no evidence whatsoever* to support their contrary assertion.  They have simply seized upon a document produced in this litigation and proclaimed it to be JPMC's "contention."  Kevin Brewer, the JPMC CFO who actually prepared the document at issue, testified quite clearly at his deposition that it was *not* intended to be an exhaustive catalog of all of JPMC's § 7.2 expenditures.  Rather, once it was clear that JPMC had spent well over the $6 million required, there was no purpose in accounting for other includable items. *See* Brewer 135-36, 174-75; JPMC SMF ¶¶ 196-204.

There are, in fact, at least two significant categories of § 7.2 expenditures that were not attempted to be captured in Hall B.  First, because the time for managers such as Wagner, Cuneo, Audenino, and others were not included in the Timekeeper/PAR systems, they are not captured by the spend numbers in Hall B (except insofar as the bottom summary  added in time for Ian Screen and Thomas Campfield, discussed *infra* at 12).  Plaintiffs, in fact, effectively concede that *some* allocation of this time is appropriate, in that they concede that the time of management such as Screen and Campfield are countable.  *See* Pls.' Br. at 13.  As shown in JPMC's own moving papers, reasonable allocations of this time (including Screen and Campfield) amount to approximately $3.28 million.  *See* JPMC Br. at 13.  Second, the numbers for 2002 in Hall B were obtained from Plexus and thus did not include any time for the programmers and consultants working at the JPMC datacenter in Brooklyn ($330,000).  *See* JPMC SMF ¶¶ 110-17.

### 3.    Plaintiffs Discount Large Expenditures With No Evidence

Plaintiffs start from this flawed premise of Hall B's exhaustiveness, and then compound

804190_3

their error by claiming certain expenditures reflected on this spreadsheet should not count towards § 7.2.  To the extent plaintiffs claim these deductions based on interpretations of § 7.2, these issues are discussed *infra* § II.B.4.  However, plaintiffs subtract large portions of the expenditures with no evidence or, in some cases, not even any apparent reasoning.

To aid the Court in the discussion that follows, below is a table summarizing the § 7.2 costs for which JPMC has submitted evidentiary support, and how plaintiffs address (or fail to address) each item:

| Item | JPMC Evidence | Plaintiffs' Treatment |
|---|---|---|
| Costs of Long Beach/NYC Programmers and Consultants 2002 | $723,000 (JPMC SMF ¶¶ 110-18) | Entirely ignore |
| Costs of Long Beach/NYC Programmers and Consultants 2003 | $3,260,000 (JPMC SMF ¶¶ 119-34) | Claim, without evidence, that costs for TCM, GMRD integration, Inalytics and Quality Assurance should be deducted $1,183,000 |
| Costs of Long Beach/NYC Programmers and Consultants 2004 | $1,750,000 (JPMC SMF ¶¶ 135-39) | Claim, without evidence, that costs for TCM, GMRD integration, and migration/upgrade of Long Beach technology should be deducted $300,000 |
| Allocations for Compensation of Plexus/JPMC Managers, Administrators, Researchers and Other Technology Workers (19 employees), 2002-04 | $3,281,000 (JPMC SMF ¶¶ 143-70) | Ignore documented work of all but 1 employee (Campfield) and, without evidence, claim that allocation should be 20% rather than 90% $267,000 |
| Allocation for Compensation of Plexus Technology/Production Staff in LA (15 employees), 2002-04 | $150,000 (JPMC SMF ¶¶ 171-95) | Claim, without evidence, that none of their work was for enhancing Plexus technology |
| Long Beach Office Rent | $81,000 (JPMC SMF ¶¶ 140-42) | Ignore |
| Total | $9,245,000 | $1,750,000 |

First, plaintiffs simply ignore spending during 2002 – approximately $374,000 on Hall B (figures from Plexus itself, *see* JPMC SMF ¶¶ 110-12) for the Long Beach development team plus another $330,000 for the work done in Brooklyn.  Plaintiffs never even acknowledge that

11

they are ignoring this spending, much less offer up any evidence to support a claim that it is not properly creditable towards § 7.2.[8]

Plaintiffs also ignore the approximately $553,000 of Long Beach 2003 tech work that was captured under the portion of "BAU" budget that was transferred to be available for the Plexus tech build.  In Audenino Ex. A, this expenditure can be seen clearly as the third column (labeled, "1/1/03 to 12/31/03 Long Beach Spend").   For some reason, this column was apparently hidden when transferred to the top of Hall B, but as can be clearly seen, the 2003 "Plexus" item at the bottom of Hall B includes this expenditure in its total of $2,484,135 (= $1,931,135 + $553,000).   Yet, plaintiffs use the $1.93 million figure from the top of Hall B, rather than the $2.48 million from the bottom, and never even acknowledge that they are choosing the former over the latter.

 Plaintiffs also significantly discount the amounts that were attributed to in Hall B (in the bottom summary) to account for the time of Ian Screen (the Plexus CIO) & Thomas Campfield (who supervised the tech build from the JPMC side).  Pls.' Br. at 13.  With respect to Screen, plaintiffs do not question that his time can be counted under § 7.2, but they assert that his time is already included in the Plexus spend numbers.  Again, however, they provide no evidence that this is true, and the evidence is in fact to the contrary.  *See* JPMC SMF ¶¶ 119-34, 143-45.  As for Campfield, again they do not dispute that some allocation of his time is proper, they merely assert, with no evidence, that the percentage should only be 20-25%.  Campfield, however, states in his declaration that the percentage should be 90-95%.  *See* Campfield Decl. ¶ 18.[9]

Finally, plaintiffs claim that no portion of the time spent by the LA office should be included, claiming that the entirety of the time spent there over the two years was devoted to "producing and collating Plexus' hard copy reports."  Pls.' Br. at 13.  However, no evidence for

---

[8] To the extent  that plaintiffs are tacitly relying on their statement that "the Bank's investment committee did not authorize any capital spending on Plexus until sometime in 2003," as already pointed out, this does not mean that no work on Plexus was going on in 2002.  *See supra* at 3.  As also demonstrated, § 7.2 is not limited to capital expenditures.  *See supra* at 8.

[9] Hall B appears to have attributed all of Screen and Campfield's time to § 7.2.  JPMC in its papers used a more conservative estimate of 90% (except for Campfield in 2002 at 95%).

this assertion is to be found, except for the fact that the argument in the brief is repeated verbatim by David Hall in his declaration.  Hall Decl. ¶ 27.  Once again, there is no basis in his declaration (or the record) for believing that Hall had that level of detailed knowledge of the work performed by the LA office, and certainly nothing that could serve to counter the substantial evidence JPMC presented in its moving papers – including deposition testimony by plaintiffs as well as emails evidencing substantial technology development work – to support a very conservative allocation of at least 10% of the time of 10 LA employees.  *See* JPMC SMF ¶¶ 171-94.

As the preceding shows, therefore, plaintiffs cannot provide even the most minimal evidence to support either (1) their claim that Hall B is exhaustive or (2) significant portions of their deductions from the numbers in Hall B.  Thus, even without addressing plaintiffs' arguments that certain expenditures do not qualify under § 7.2 – which are similarly inadequate, as shown *infra* § II.B.4 – the following is the *best* that plaintiffs have shown on their motion:

| | |
|---|---:|
| Plaintiff's Total (see Pls.' Br. at 13) | $1,750,000 |
| + Management allocation (inc. Screen & Campfield) not already included by plaintiffs[10] | 3,014,000 |
| + 2002 expenditures | 723,000 |
| + 2003 Long Beach "BAU" transfer expenditure | 553,000 |
| + LA Office Allocation | 150,000 |
| + Long Beach Rent (2003-04) | 81,000 |
| Total | $6,271,000 |

Thus, even if one were to credit plaintiffs' evidence and arguments, discussed *infra*, that TCM, GMRD and assorted other items do not properly count towards § 7.2 because they were not for the purpose of enhancing Plexus' technology, plaintiffs' evidence does not even permit a finding that the total expenditure was less than $6 million.

### 4.  Other Expenditures Clearly Were for the Purpose of Enhancing Plexus' Technology

Plaintiffs further claim that there are 5 areas of expenditure – a total of approximately $3.0 million – that should be subtracted from the numbers in Hall B:  (1) TCM; (2) GMRD; (3)

---

[10] $3,281,000 total less approximately $267,000 included by plaintiffs for Campfield.

Migration from Long Beach to Metrotech; (4) Inalytics; and (5) Infoco transition reports.  Pls.'
Br. at 9-12.  Even if plaintiffs were to successfully prove these contentions, the subtraction of
these $3.0 million in expenditures from the evidence JPMC has provided still leaves over $6
million in § 7.2 spend undisturbed.  Plaintiffs, however, have not submitted sufficient evidence
on these expenditures to compel a finding that they are not properly countable.

### a.      TCM/GMRD

Starting with the first two of these items – TCM and GMRD – plaintiffs' argument, more
or less in its entirety, is the following:  "Valued Holdings, Trade Starr, Efritz, and TCM were all
business units or products of JPMC's InfoCo, and not of Plexus.  Thus, they were irrelevant in
terms of the Plexus build."  Pls.' Br. at 9.  As an initial matter, JPMC is in agreement that Valued
Holdings, Trade Starr and Efritz should, at least for purposes of these motions, not be counted
towards the § 7.2 spend (because they represented the other, non-Plexus products to be delivered
within TCM), and in its motion for summary judgment JPMC did not include them.

Beyond these products, however, plaintiffs submit *no* evidence to substantiate their claim
that the TCM and GMRD expenditures were not for the purpose of enhancing Plexus'
technology.  They submit no evidence as to what work was accomplished by the programmer
work that falls under the particular expenditures labeled "TCM" or "GMRD," much less
evidence sufficient to show that the work was intended for purposes other than enhancing
Plexus' technology.  And it is a complete *non sequitur* to assert, as plaintiffs do, that because
something is a "unit or product of InfoCo" – InfoCo being the business division of which Plexus
was the major part – that it follows that it was "irrelevant" to Plexus.

In fact, the evidence is overwhelmingly to the contrary.  It was understood from the very
beginning that TCM – or, as it was originally to be known, IMVEPS – was to be, in effect, an
internet portal by which JPMC clients would access a suite of analytical services, of which
Plexus' TCA analysis was to be the most important.  TCM was, in other words, *the* intended
delivery system for Plexus.  *See* Campfield Decl. ¶ 14; Audenino Decl. ¶ 7.  Plaintiffs were well
aware of this from the outset and were fully in support of this model. JPMC SMF ¶¶ 94-100.  For

14

them now to claim that TCM is "irrelevant" is simply contrary to all of the evidence.

As for GMRD, once again the evidence is that connecting Plexus to this database was an important part of the Plexus technology enhancement. GMRD was JPMC's gold-standard database of market indicative data, and integrating it with Plexus was always understood to be a priority. *See* Audenino Decl. ¶ 7; Campfield Decl. ¶ 14. Indeed, plaintiffs do not even dispute this: as they admit, the technology plan by Ian Screen specifically included manpower for "GMRD integration." *See* Pls.' Br. at 10 n.8; Ex. 161 (2d p.). Plaintiffs' claim that this was associated with the fixed income product is demonstrably false since, as their expert who reviewed the plan admitted, fixed income was not part of the Screen plan. Rosen 228. Plaintiffs are left to rely on the claim that because GMRD integration did not appear in the original plan until 2004, any GMRD work done in 2003 must therefore have been for non-Plexus-related work. There is, obviously, no reason why this is necessarily true.

### b. Migration/Upgrade From Long Beach to a JPMC Data Center In Brooklyn

In 2004, JPMC expended funds for the purpose of moving Plexus' operating systems and applications from Plexus' original Long Beach hardware to the JPMC Metrotech data center in Brooklyn. Plaintiffs claim that this migration "was purely for JPMC's convenience" as a result of the decision to close the Long Beach development work, and further assert that it should not count towards § 7.2 because it "had no positive impact on Plexus' revenue generation." Pls.' Br. at 12. Both assertions are unsupported by any evidence (indeed, overwhelmingly contradicted by JPMC's evidence), and the second also relies on an unjustified interpretation of § 7.2.

At the risk of being repetitive, yet again plaintiffs offer no evidence to support their claim that the purpose of the migration was driven entirely, or even at all, by "JPMC's convenience." David Hall does not, and cannot, claim to have personal knowledge of this decision or indeed to have played any role in it whatsoever. By contrast, those who actually did play a role in the decision have stated quite clearly that the reason for the migration was that JPMC naturally had high standards for technology that would handle (among other things) highly sensitive customer data, that the Plexus Long Beach facilities simply did not live up to those standards, particularly

15

in areas such as security, stability, and disaster recovery, and that integration with JPMC technology would be an overall benefit to Plexus.  Contemporaneous evidence supports that view, and even Ian Screen agreed with it.  Campfield Decl. ¶ 7-8; Audenino Decl. ¶¶ 3-4; JPMC SMF ¶¶ 81-87.

Plaintiffs present <u>no</u> evidence that these concerns were not the real motivation behind the migration.  Their only evidence proffered on this point is a summary comparison of the Long Beach and Metrotech hardware which plaintiffs say shows the equality or superiority of the former.  Pls.' Br. at 13 (citing Adler Exh. J).  But this simple comparison tells us nothing about the relative security and reliability of the two installations.  Indeed, plaintiffs' expert, Joseph Rosen – from whose report the statements in the brief (and in David Hall's declaration) were lifted *verbatim*, see Rosen Rep. (Ex. C) at 38 – admitted that he had misread the comparison in Adler Ex. J in reaching his conclusion about the relative merits of the two installations, *see* Rosen 138-41, and he further conceded that JPMC management could legitimately have believed that reliability and security would be enhanced by the migration, *id.* 147, 153-54.[11]

As for plaintiffs' unsupported assertion that "the migration had no positive impact on Plexus' revenue generation" it is quite clear that this is not true.  All of the Plexus product enhancements in the world would be for naught if they were not housed in an environment secure enough (by JPMC standards) so that customers could be allowed to access them.  And as Thomas Campfield states in his declaration, at least one client (Norges Bank) refused to enter into a more lucrative contract for Plexus until its security concerns could be addressed – which concerns were to be addressed by the migration to Brooklyn.  Campfield Decl. ¶ 7.

Plaintiffs' argument rests on the unstated premise that to "enhance" Plexus' technology within the meaning of § 7.2 can only mean increasing Plexus' revenues, but there is nothing in the plain language of § 7.2 that says this.  The word "enhance" means, simply, "to increase the

---

[11] Plaintiffs claim that Adler Ex. K demonstrates that "the migration also appears to have made the technology platform less stable."  Ex. K says nothing about this.  In any case, the fact that there might have been some post-migration difficulties is neither surprising nor in any way contradictory of the fact that the move's purpose was for enhancement of security and reliability.

16

worth or value of." *Webster's Third New Int'l Dictionary, Unabridged* (2002). There can be no reasonable dispute that improving the security and reliability of the Plexus technology platform is an "enhancement," – as even plaintiffs' expert agreed. Rosen 153-54.[12]

### c.      Inalytics, Quality Assurance, Transition

As for the $133,000 of expenditures labeled "Inalytics" in the 2003 expenditure totals, plaintiffs claim that these represent nothing more than the reformatting of certain paper reports. While it is true such work was done, plaintiffs have submitted no evidence that these charges were for such work. It is clear, moreover, that work for "Inalytics integration" was always a part of the tech build plan created by Ian Screen (upon which plaintiffs rely). *See* Ex. 161 (page 3). Further, to the extent that the report reformulation required changes to the Plexus internal computer programs that generated these reports, these are plainly enhancements to either the "technology platform" (even by plaintiffs' own definition, see Pls.' Br. at 5) or, more accurately, to the Plexus "applications," since, as discussed *supra*, nothing in "applications . . . used by [Plexus]" requires that the end users of such applications be Plexus clients, as opposed to Plexus personnel themselves.[13] The foregoing applies equally to the claim that charges under "Sponsor Monitor Executive Summary Report" are not countable under § 7.2.[14]

Finally, plaintiffs present no evidence that the charges under "Infoco Quality Assurance" and "Plexus Transition Reports" represent work to "check the quality of other, non-Plexus, products or to improve existing Plexus paper reports." Pls.' Br. at 10. Plaintiffs appear once again to rely on the absurd notion that charges labeled "Infoco" cannot be Plexus. And again,

---

[12] Nor, of course, does § 7.2 require that the expenditure *actually* have resulted in an enhancement, provided that the expenditure was genuinely for the *purpose* of enhancement.

[13] Furthermore, as even plaintiffs admit, the entire purpose of the Inalytics partnership was to sell Plexus products in Europe and thus "contribute greatly toward Plexus exceeding its revenue targets." Compl. ¶ 40; *see also* JPMC SMF ¶¶ 63-71. Plaintiffs tacitly concede that an expenditure with "positive impact on Plexus' revenue generation" would be countable towards § 7.2. *See* Pls.' Br. at 12.

[14] The Ian Screen build plan specifically included, under "Build-Applications," manpower for Sponsor Monitor (including "Base product redesign" and "Inalytics requirements"). Ex. 161 (p. 2); *see also* Ex. 38 (listing as one of the "four biggest opportunities" to "Complete a New Executive Summary for Sponsor Monitor" that would allow Plexus to "increase existing client fees, open up new markets" and "integrate Inalytics").

17

Ian Screen's original tech build plan included substantial expenditures for Quality Assurance and for Transition Reports. *See* Ex. 161 (p.2). Plaintiffs have provided nothing to support their assertion as to what this work accomplished or whether it enhanced Plexus' technology.

In sum, except for Valued Holdings, TradeStarr and Efritz – which JPMC agrees do not count – plaintiffs have provided no evidence that, even taken alone, would compel a finding by this Court that JPMC did not spend at least $6 million "for the purpose of the enhancing [Plexus'] existing technology platform and applications and delivery systems used by [Plexus]." Indeed, plaintiffs' evidence, to the extent they offer any, is insufficient to even create a triable issue as to any of the over $9 million in expenditures that JPMC demonstrated on its opening motion for summary judgment. Not only, therefore, is it clear that plaintiffs' motion must be denied, but it is equally clear that JPMC's motion must be granted.

## III.   JPMC'S SALE OF PLEXUS TO ITG DID NOT BREACH THE SPA

Plaintiffs fare no better in their claim that the sale of Plexus to ITG at the start of 2006 breached the implied covenant of good faith and fair dealing.[15] First, as pointed out in JPMC's opening brief, this claim is not fairly presented in the complaint in this action, and thus plaintiffs cannot proceed on it. *See Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 323-24 (S.D.N.Y. 2009). Even if they could, however, it is plain that they have not made a sufficient case for summary judgment. Quite the contrary: not only is it clear that the sale to ITG – a sale plaintiffs themselves requested – in no way caused them any damages, there is also no basis for this Court to find that JPMC's sale breached any contractual obligation, implied or otherwise. Summary judgment for JPMC dismissing this claim is required.

### A.   Plaintiffs Have Shown No Breach of the Implied Covenant of Good Faith

It is indisputable that there is no express term in the SPA preventing a sale, and plaintiffs

---

[15] While plaintiffs reiterate their complaints about JPMC's purported mismanagement, plaintiffs disclaim any intent to seek summary judgment on those grounds. *See* Pls.' Br. at 15; 20 n.10. JPMC thus does not address them here, other than to direct the Court to the substantial evidence presented by JPMC on its own summary judgment motion. *See* JPMC Br. at 5-12.

have never claimed otherwise.[16]  *See* Edwards 13-18.  They do claim, however, that the implied covenant of good faith and fair dealing imposed such an obligation.  Pls.' Br. at 19.  Such a claim, however, requires *at a minimum* that the alleged breach "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *37 (S.D.N.Y. 2009).

In fact, although plaintiffs assert that the sale of Plexus to ITG "deprived plaintiffs of receiving the benefit their bargain" because the sale "obviously precluded" plaintiffs from receiving the Incentive Payments for 2006 and 2007 (Pls.' Br. at 15, 19), there is no support whatsoever for this claim.[17]   Rather, the evidence is clear – and plaintiffs themselves acknowledged in contemporaneous emails – that by the time of the ITG sale there was no realistic chance at all for Plexus to hit the 2006-07 earnout targets.[18]   JPMC SMF ¶¶ 20-27. Indeed, plaintiffs nowhere even claim – because such a claim would be false on its face – that, at the time of the sale, Plexus was on track to make sales in 2006 or 2007 that would have been sufficient to reach the earnout targets for the Incentive Payments had Plexus remained a part of JPMC.  Nor do they cite a single piece of evidence suggesting that *anyone* at Plexus or JPMC, at the time of the sale, believed that the 2006-07 earnout targets could still be achieved.  Indeed, according the Complaint, the failure to complete an effective overhaul of Plexus's technology in

---

[16] Plaintiffs' attempt to read such an obligation into § 8.2 fails for the reasons stated in JPMC's opening summary judgment brief – i.e., § 8.2 is a merely a pledge of cooperation among the parties to take the necessary steps to close the SPA itself.  *See* JPMC Br. at 6-7.

[17] Plaintiffs also claim that the sale prevented them "from receiving, based upon the cumulative revenue provisions, any Earn-Out monies they did not qualify for in previous years." Pls.' Br. at 15-16.  This is a misrepresentation of the Earn-Out provisions.  The Subsequent Payments (for 2003-05) and the Incentive Payments (for 2006-07) operate separately under the SPA.  The catch-up provision based on year-end 2007 revenue only allowed for the possibility of receiving the missed Incentive Payments, if any.  *See* SPA § 2.2(c); 2.3(c).

[18] Indeed, Plexus revenues through September 2005 were only $8.0 million, with essentially no growth at all over 2004.  Ex. 169.  Full year revenue at that run rate would equal $10.67 million.  Thus, Plexus was several millions short of achieving any earnout even for 2005. (It needed revenues of $13.5 million: 80% of target of $43.1 million, less 2003-04 combined revenues of $21 million, see Adler Ex. G, at 14).  Understandably, plaintiffs do not pretend there was any realistic possibility of earning $20.7 million in 2006 -- almost double the estimated $10.67 million in 2005 – which is what was needed just to achieve 80% of the 2006 cumulative revenue target of $65.5 million.

2003-04 had negated any such aggressively optimistic prospects for growth. These undisputed facts alone preclude a showing that plaintiffs were deprived of the "fruits of the contract" so as to support a claim for breach of the obligation of good faith.[19] It also precludes plaintiffs from establishing the damages element of *any* breach of contract claim related to the sale.

Plaintiffs' claim also fails for another, equally fundamental reason: As JPMC demonstrated in its opening brief on summary judgment, *see* JPMC Br. at 7-10, in order to establish a breach of the implied covenant of good faith, plaintiffs must prove *bad faith* – i.e., that JPMC by the sale "sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *DeBlasio*, at *37.[20] Plaintiffs provide not a shred of evidence that JPMC acted with such an intent. The evidence, rather – including that relied upon by plaintiffs themselves – is clear that JPMC undertook a careful analysis of the alternatives and concluded that Plexus was not a good long-term fit for JPMC and thus both Plexus and JPMC would be better off if Plexus were sold.

Any claim of bad faith is particularly absurd in light of two facts. First, the interests of JPMC and plaintiffs were fully aligned: if Plexus had been able to achieve revenues sufficient to meet the Incentive Payment targets, JPMC would have benefited far more than it ultimately had to pay out in earnouts. Thus, the suggestion by plaintiffs that JPMC sold Plexus in order to avoid its earnout obligations is not only profoundly illogical but unsupported by any evidence.

Second, the process that led to the sale was initiated by a request *from plaintiffs* – in

---

[19] Absent the possibility of making the Incentive Payment revenue targets, it is immaterial, even if it were true, that the sale to ITG rendered revenue determination "impossible," as plaintiffs claim. And plaintiffs offer no admissible evidence to support this contention. The idea that Hall is competent to testify on this point is particularly absurd, as Hall left Plexus in June 2004 – well before the idea of a sale to ITG began to be explored.

[20] Plaintiffs' citation to *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827 (1978), for the proposition that the implied covenant of good faith and fair dealing "encompass[es] 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included,'" Pls.' Br. at 20 (quoting *Rowe*, 46 N.Y.2d at 69), is in error. That statement in *Rowe* is not related to the implied covenant of good faith and fair dealing, but rather to implied-in-fact covenants; as stated *infra*, the Court then goes on to describe the "heavy burden" associated with proving the existence of such an implied term. *See* 46 N.Y.2d at 68-69. *Rowe* held that there was no breach of the implied covenant of good faith and fair dealing because it "[did not] appear that [defendant] acted in bad faith." *Id.* at 68.

particular, Wayne Wagner – for JPMC to sell Plexus.  JPMC SMF ¶ 103-05.  As plaintiffs' own evidence shows, they were kept informed of and involved in the economic analysis.  Adler Ex. B.  And there is no evidence that they ever raised any objection to the sale.  JPMC SMF ¶ 106.  This fact alone renders a claim of bad faith on JPMC's part untenable, and also creates at least a triable issue as to whether plaintiffs' claim is barred by waiver or estoppel, *see infra* § III.C.

The two cases plaintiffs rely upon, *A.W. Fiur Co. v. Ataka & Co.*, 71 A.D.2d 370, 422 N.Y.S.2d 419 (1st Dep't 1979), and *407 E. 61st St. Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 296 N.Y.S.2d 338 (1968), are not to the contrary.  As discussed *infra*, *407 E. 61st* turned on an implied-in-fact covenant, not the covenant of good faith, and to the extent *A.W. Fiur* relied upon the implied covenant of good faith, it was only to hold that the defendant could not, consistent with its good faith obligation, terminate the business for which it had hired plaintiff as its sales agent "solely by reason of the [plaintiff's] unwillingness to modify the contract."  71 A.D.2d at 374-75.  In other words, while the defendant in that case had no obligation to approve any sales, it could not arbitrarily refuse all business and certainly could not do so in order to punish the plaintiff for refusing to renegotiate.  There is no claim here, much less evidence, of any remotely analogous behavior on JPMC's part.  Plaintiffs have provided no evidence to even permit a finding of a breach of the covenant of good faith and fair dealing.

### B.  Plaintiffs Have Not Shown Any Implied-in-Fact Obligation Not to Sell

As for plaintiffs' assertion that "an agreement for the rendition of service to a business implies a promise that the party to whom the services are rendered will continue to remain in business," Pls.' Br. at 20, the cases neither stand for such a stark proposition nor are they apposite here.  First, as *407 E. 61st* makes clear, to the extent any such obligation arises, it is not part of the implied covenant of good faith but rather "*may be implied in fact* as part of an agreement for the rendition of services to a business." 23 N.Y.2d at 280.[21]  It is well-settled that

---

[21] Thus, to the extent the statement in *A.W. Fiur* suggests that such an obligation is *necessarily* imposed, it is inconsistent with the Court of Appeals' holding in *407 E. 61st*, which of course controls.  But, in fact, the actual holding was that there was a triable issue as to whether the defendant's withdrawal from the business constituted a breach.  *See* 71 A.D.2d at 375.

> a party who asserts the existence of an implied-in-fact covenant bears a heavy
> burden, for it is not the function of the courts to remake the contract agreed to by
> the parties, but rather to enforce it as it exists. Thus, a party making such a claim
> must prove not merely that it would have been better or more sensible to include
> such a covenant, but rather that the particular unexpressed promise sought to be
> enforced is in fact implicit in the agreement viewed as a whole.

*Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827 (1978).  Particularly where (as here), an integrated contract was the subject of extended negotiations between sophisticated, counseled businesspersons, "'courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'"  *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765 (2004) (quoting *Rowe*, 46 N.Y.2d at 72); *Reiss v. Fin. Perf. Corp.*, 97 N.Y.2d 195, 198-99, 738 N.Y.S.2d 658 (2001); *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 557 (S.D.N.Y. 2009).

Plaintiffs offer no evidence that any such obligation was necessarily intended and agreed to by the parties here.  Given the hopelessness of reaching the earnout targets, the promise that would have to be implied in this case would be that JPMC would not sell, *regardless of its possible effect on the earnouts.*  The idea that the purchaser of a business would be prohibited from subsequently selling it is counterintuitive enough, but such an absurd obligation as plaintiffs necessarily suggest is inconceivable.  Certainly, there is no evidence from which plaintiffs can demonstrate that JPMC did, in fact, agree (even impliedly) to such a restriction.[22]

---

[22] Plaintiffs' reference to an analysis of the sale which referred to "Unrealized Earn Outs" costs of approximately $8 million, see Pls.' Br. at 15, does not support their claim.  To the extent plaintiffs are attempting to suggest that these documents reflect a recognition by JPMC that it would have to pay the earnouts upon a sale of Plexus, the documents on their face say nothing of the kind and plaintiffs offer no evidence to the contrary.  Cesar Estrada and Kevin Brewer, who oversaw the analysis, testified that any such assumption was simply a "worst-case scenario" for analysis purposes but did not reflect a belief or conclusion that JPMC had any such ongoing liability.  Estrada 90-93, 211-12; Brewer 278-81.  These bare line items from 2005 documents, unsupported by any other evidence, can hardly carry plaintiffs' "heavy burden" to show an implied term in the 2002 SPA barring a sale.  Indeed, Estrada further testified that, later in 2005, JPMC told ITG of its conclusion that it had no continuing liability with respect to the earnouts, Estrada 211-12, which is hardly surprising given the absence of any acceleration provision in the SPA and the understanding by both Plexus and JPMC that there were no longer any realistic prospects for achieving the earnout goals.  Moreover, plaintiffs' untenable claim that JPMC sold Plexus in order to avoid paying the earnouts is further negated by these very documents since, to the extent JPMC contemplated any theoretical worst-case scenario involving a future payment of earnouts, that cost was included as part of the sale scenario.

Put another way: the assumption that JPMC retained the right to sell Plexus during the earnout period in a situation where it would not affect the Incentive Payments does not render the SPA a commercially inexplicable transaction, deprive plaintiffs of their reasons for entering the sale or somehow place them at JPMC's mercy.  Even if a JPMC sale *might* have affected the earnouts – which plaintiffs have not shown – the transaction still is a complete, rational business deal.  Not as favorable to plaintiffs, perhaps, but certainly not "necessary to effectuate the purposes of the contract."  *Laugh Factory*, 608 F. Supp. 2d at 557.  And plaintiffs were at all times protected by JPMC's obligation of good faith, an obligation with which JPMC fully complied.  It simply cannot be said that no reasonable persons in plaintiffs' position would have entered into the SPA absent a restriction on JPMC's right to sell.  *See Rowe*, 46 N.Y.2d at 70.

Plaintiffs' statement that they "clearly would not have sold their interests in Plexus if the Bank had the right during the Earn-Out Period to sell the business and deprive them of a large portion of the purchase price," Pls.' Br. at 21, even were it supported by any evidence (which it is not), is insufficient.  The sale did *not* deprive them of the Incentive Payments, which were in any case not part of the purchase price.  And plaintiffs *did* enter into an agreement without an explicit restriction on the sale of Plexus; surely if had been as important as plaintiffs now claim, they would have sought protection in the contract.  Finally, an implied-in-fact covenant is one to which *both* parties impliedly agree (but fail to express explicitly).  *See Rowe*, 46 N.Y.2d at 68-69.  It is not enough to claim that plaintiffs would not have entered into the contract with the provision they seek to imply; they must also demonstrate that JPMC would have agreed – indeed, *did agree* – to that provision.  *See Neuman v. Pike*, 591 F.2d 191, 195 (2d Cir. 1979) ("A promise by the defendant should be implied only if the court may rightfully assume that the parties would have included it in their written agreement had their attention been called to it.").  It is totally implausible that JPMC would have agreed it could not in good faith sell Plexus– at least, not without extracting a substantial price for that forbearance.  *Cf. Rowe*, 46 N.Y.2d at 72.

*407 E. 61st* is completely distinguishable.  There, the plaintiff garage entered into a contract whereby it agreed to provide services to the defendant Savoy Hotel's guests.  The hotel

23

did not agree to pay anything to the garage (in fact, the garage paid the hotel a fee for its preferred position), but was only obligated to use its best efforts to direct hotel guests to the garage. In order to fulfill its obligations, the garage had undertaken certain responsibilities (e.g., obtaining insurance). But the plaintiff garage's *only* benefit from the contract came from the fees paid by the hotel guests; if the hotel were to go out of business, the garage necessarily lost all of its compensation. Under these circumstances, said the Court of Appeals, an obligation on the part of the hotel to remain in business for the term of the contract *might* be implied in fact.

In other words, the most that this case says is that where one party obligates itself to provide services to another, incurs expenses or undertakes obligations in order to provide those services, and in exchange its sole compensation is necessarily dependent upon the other party's remaining in business, an obligation for that party to remain in business *might* be implied in fact. But none of these circumstances obtains in this case. The Incentive Payees were under no obligation whatsoever to remain at Plexus or to provide any services to JPMC; they were free to leave at any time.[23] To the extent they *did* remain employed at Plexus/JPMC, their services were well-compensated in terms of salary, benefits and bonuses. And, as discussed, plaintiffs have done nothing to show that the sale of Plexus had any impact on their earnout rights, much less that these rights were dependent upon JPMC's continued ownership.

Indeed, the facts of this case are much more like *Rowe*, where the Court of Appeals refused to find that the defendant-tenant had breached an implied covenant in its lease by shutting down its unprofitable store and assigning the lease – despite the fact that the landlord had the potential to earn a percentage of the store's profits – where the profit sharing was dependent upon aggressive sales goals and did not represent the landlord's sole compensation.[24] *See* 46 N.Y.2d at 71-72. Unlike *407 E. 61st*, therefore, there is no basis to imply an obligation on JPMC's part not to sell. Summary judgment is thus not only improper for plaintiffs, but is

---

[23] Thus, plaintiffs' repeated assertions that the sale to ITG "prevented Plaintiffs from performing," *see* Pls.' Br. at 21, are nonsensical; there was no "performance" due from plaintiffs.

[24] The Court also pointedly noted that the contract at issue was negotiated by sophisticated, counseled business parties after a lengthy negotiation. *See* 46 N.Y.2d at 72.

clearly warranted for JPMC due to the lack of any evidence of breach.  *See Laugh Factory*, 608 F. Supp. 2d at 557 (granting summary judgment where party asserting breach of implied-in-fact covenant failed to produce evidence demonstrating its existence); *Lotz v. Charles Crosby & Son, Inc.*, 2009 WL 2156916, at *5-6 (N.D.N.Y. 2009) (same).

### C.   There Is at Least a Triable Issue as to Waiver or Estoppel

Finally, it was plaintiffs who first approached JPMC and asked that Plexus be sold. JPMC SMF ¶¶ 101-05.  As plaintiffs' own evidence shows, they were kept informed of and involved in the economic analysis, and there is no evidence that they ever raised any objection to the sale.  *Id.* ¶ 106, Adler Ex. B. Thus, even if it had been the case that plaintiffs had a right to prevent such a sale – a claim for which, as demonstrated, there is zero evidence – plaintiffs either voluntarily agreed not to enforce that right, or by their actions led JPMC to reasonably believe that they would not enforce that right.  There is thus at the very least a triable issue as to whether plaintiffs' claim is barred by waiver or estoppel, *see Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 183-85, 451 N.Y.S.2d 663 (1982) (recounting elements of waiver and estoppel), precluding summary judgment for that additional reason.

### CONCLUSION

Plaintiffs have failed to provide evidence sufficient to compel a finding that JPMC breached the SPA, either by failing to spend at least $6 million pursuant to § 7.2 or by selling Plexus to ITG.  Accordingly, plaintiffs' motion for summary judgment must be denied.

Dated:   May 17, 2010            SATTERLEE STEPHENS BURKE & BURKE LLP
         New York, NY

                                 /s/ Joshua M. Rubins
                                 James J. Coster
                                 Joshua M. Rubins
                                 Glenn C. Edwards
                                 230 Park Avenue, 11th Floor
                                 New York, NY  10169
                                 (212) 818-9200 / (212) 818-9606/7 (fax)
                                 *Attorneys for Defendant*

804190_3